JOHN G. CURTIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17069. Promulgated May 23, 1949.

*C. B. Heinemann, Jr., Esq.*, for the petitioner.
*Jackson L. Boughner, Esq.*, for the respondent.

#### OPINION.

KERN, *Judge*: Respondent determined a deficiency in petitioner's income tax for the calendar year 1943 in the amount of $18,039.87. The year 1942 is also involved by virtue of the provisions of the Current Tax Payment Act of 1943.

The other adjustments made by respondent having been conceded by petitioner, one basic problem remains: The manner in which petitioner is obliged to treat for income tax purposes the net amount of payments made by him in 1942 to the other members of a partnership, pursuant to his personal guaranty to them of certain minimum drawing accounts, and the receipt by him in 1943 from the partnership, out of its income, of the amount so paid out. Respondent contends that petitioner incurred a loss in 1942 and received taxable gain in 1943; whereas, petitioner urges that the payments in 1942 were mere advances and resulted in no loss, and their repayment in 1943 necessarily did not result in taxable income.

All of the facts are stipulated and are hereby found accordingly.

During 1942 and 1943 petitioner was a resident of Chicago, Illinois, and filed his returns, prepared on a cash and calendar year basis, with the collector for the first district of Illinois.

He was a partner in the brokerage firm of Clement, Curtis & Co. which was established by an agreement dated December 31, 1940. The other original partners were Arthur F. Lindley and Irving E. Marcus. Each contributed to the business the use of stock exchange memberships as well as substantial capital. Pursuant to the agreement, each was entitled to interest on the amount of his capital account at 5 per cent per annum; net profits, determined after deducting the interest payments, were to be shared equally. Net losses, however, were to be borne solely by petitioner. Petitioner also guaranteed to the other partners certain minimum drawing accounts, even if their shares of net profits were insufficient, and such payments were to be "borne absolutely" by him.

On December 15, 1941, a supplemental agreement was executed and three new partners—Roy E. Bard, Lawrence Williams, and James P. Doherty—were added. Bard contributed capital and the use of a membership; Doherty contributed the use of a membership, which, as with the others, was considered a capital contribution at an assigned value of $500; Williams made no capital contribution whatsoever. As in the earlier agreement, it was provided in paragraph 7 of the supplemental agreement that all net losses were to be borne by petitioner. Net profits were to be credited to the parties in certain determined percentages, and each was to have a drawing account, all as follows:

|  | Percentage of profits | Monthly drawing account |
|---|---|---|
| Lindley | 20% | $500 |
| Marcus | 20% | 600 |
| Bard | 20% | 1,000 |
| Williams | 5% | 500 |
| Doherty | 5% | 600 |
| Petitioner | 20% | ------------ |

The remaining 10 per cent of the net profits was to be paid to the partners as petitioner directed.

The drawing accounts were to be charged against each partner's interest in the net profits, but, as in the earlier agreement, petitioner guaranteed the respective drawing accounts, whether or not there were sufficient net profits to meet the established minimums.

On May 12, 1942, the partners entered into another supplemental agreement, modifying and amending their earlier agreements. The material modification was as follows:

* * * in the event any loss shall be sustained by said John Guernsey Curtis in the conduct of said partnership business during the year 1942 under the

provisions of said Supplemental Agreement of December 15, 1941, and particularly under the provisions of paragraph No. 7 of said Supplemental Agreement, including any net loss resulting from the operation of said business which shall be borne by said John Guernsey Curtis pursuant to the provisions of said paragraph, and any loss sustained by him in making up to the other members of said partnership their several drawing accounts all as provided in said paragraph No. 7, and in the event the partnership shall be continued beyond and after the 31st day of December, 1942, then the net profits of the business earned during the continued operation of the partnership beyond and after said 31st day of December, 1942, shall be first applied in payment to said John Guernsey Curtis of any losses so incurred by him during said year 1942 before any of said net profits shall be distributable to the respective members of said partnership as provided in paragraph No. 7 of said supplemental agreement of December 15, 1941, and only that portion of the net profits remaining after making up said losses shall be distributed among the members of said partnership as provided in said paragraph; provided that the said John Guernsey Curtis shall continue from and after December 31, 1942, in the event said partnership shall be continued beyond and after said date, to bear any deficiency in the amounts of the drawing accounts of the several members of said partnership to which said members are respectively entitled in case the amounts of the net profits which they shall respectively be entitled to receive shall be less than the amounts of said respective drawing accounts.

By further amendment, provision was made that Williams, who was about to enter the armed forces, should no longer be entitled to his monthly drawing account after leaving the partnership. By a supplemental agreement of July 1, 1942, it was provided that Marcus, who desired to take an indefinite leave of absence from the partnership, should not receive any monthly drawing account.

For the year 1942 the partnership reported ordinary net income of $24,683.21, on the accrual basis. Pursuant to the agreements of the partners, the sum of $23,782.20 was credited as interest on the partners' capital balances, and the remaining net profits were distributed on the partnership books to those entitled. Since net profits did not equal the guaranteed drawing accounts of the partners, petitioner was obliged to make up the difference. The distributions were as follows:

| Partner | Interest on capital | Net profit (or loss) | Total distribution as reported on partnership return |
|---|---|---|---|
| Bard | $2,027.74 | $12,000.00 | $14,027.74 |
| Doherty | 24.88 | 7,200.00 | 7,224.88 |
| Lindley | 4,161.57 | 6,000.00 | 10,161.57 |
| Marcus | 3,362.26 | 3,600.00 | 6,962.26 |
| Williams | None | 6,000.00 | 6,000.00 |
| Petitioner | 14,205.75 | (33,898.99) | (19,693.24) |
| Total | 23,782.20 | 901.01 | 24,683.21 |

For the year 1943 the partnership reported ordinary net income of $100,179.86, on the accrual basis. Pursuant to the agreements, this sum was distributed on the partnership books, as follows:

| Partner | Interest on capital | Net profit | Total distribution as reported on partnership return |
|---|---|---|---|
| Bard | $2,054.80 | $12,000.00 | $14,054.80 |
| Doherty | 25.00 | 8,400.00 | 8,425.00 |
| Lindley | 3,798.08 | 8,790.89 | 12,588.97 |
| Marcus | 3,145.08 | 3,390.89 | 6,535.97 |
| Williams | None | 2,197.74 | 2,197.74 |
| Petitioner | 13,687.50 | 42,689.88 | 56,377.38 |
| Total | 22,710.46 | 77,469.40 | 100,179.86 |

The amounts set apart to petitioner included the sum of the payments which he had made to the other partners pursuant to his guaranty of minimum drawing accounts. On December 31, 1943, the following entry was made on the partnership books:

| Dr. | Cr. | | | |
|---|---|---|---|---|
| Profit and loss | | Adjustment of 1942 results, profit and loss. | $19,693.24 | |
| | John G. Curtis | Adjustment of 1942 results, profit and loss. | | $19,693.24 |
| Profit and loss | | Adjustment of 1942 results, interest | 14,205.75 | |
| | John G. Curtis | Adjustment of 1942 results, interest | | 14,205.75 |

In petitioner's private account in the partnership ledger, entries were made to reflect the situation in 1942, which can be summarized as follows:

| Dr. | Cr. | Date | Explanation |
|---|---|---|---|
| $33,898.99 | $14,205.75 | (Monthly) | Total of interest on capital account. |
| | | 12/31/42 | To profit and loss in accordance with partnership agreement. |

The corresponding credit to the debit entry of $33,898.99 was to profit and loss to close out that account. It was determined in that account as the difference between drawings of other partners ($34,800) less net profit of $901.01.

A summary of the entries in petitioner's private account for 1943 reflects the following:

| Dr. | Cr. | Date | Explanation |
|---|---|---|---|
| | $13,687.50 | (Monthly) | (Total of interest on capital account.) |
| | 19,693.24 | 12/31/43 | Adjustment of 1942 results, profit and loss. |
| | 14,205.75 | 12/31/43 | Adjustment of 1942 results, interest. |
| | 8,790.89 | 12/31/43 | From profit and loss. |

On petitioner's return for 1942 he deducted a loss from the partnership of $19,693.24, which he now claims to be error. On his 1943 return, he reported income from the partnership of $36,684.14. This was determined in the following manner:

$13,687.50   Interest on capital account
14,205.75   Adjustment of 1942 profit and loss interest
8,790.89   Profit and loss

36,684.14

In the deficiency notice, respondent determined that the ordinary net income of the partnership and petitioner's distributive share thereof for 1942 should be increased by $3,196.24, which is agreed to by petitioner. Respondent determined that petitioner's distributive share of the partnership net income for 1943 should be increased by $179.80, which is agreed to by petitioner. The respondent also increased petitioner's income from the partnership for 1943, as reported by him, by $19,693.24, being the difference between such distributive share as reported on the partnership return ($56,377.38), and the amount reported as income from the partnership by petitioner ($36,684.14), to which adjustment petitioner objects.

Petitioner recognizes that he can support the position he now urges only by confessing that he erroneously treated as a loss in 1942 the net amount he was required to pay over to his partners in fulfillment of his personal guaranty [1] to them, and that the same error was made on the partnership return for that year. Since the taxable year 1942 is before us and the point urged has been raised in the petition, petitioner can, of course, have his tax liability determined on the basis of the true facts. *Gutterman Strauss Co.*, 1 B. T. A. 243; *Sommerfeld Machine Co.*, 11 T. C. 86. However, it should be observed that the manner in which petitioner and the partnership did at the time report the transaction is of significance in assaying its true nature and effect, particularly where, as here, the principle embodied in the returns is accepted by respondent. *Bedell* v. *Commissioner*, 30 Fed. (2d) 622, affirming 9 B. T. A. 270; *Roche* v. *Commissioner*, 63 Fed. (2d) 623. In any event, the burden of proof is upon petitioner to demonstrate that there was no reportable loss in 1942 from the partnership business and no taxable gain in 1943 to the extent respondent claims. Rule 32, Rules of Practice before the Tax Court.

Petitioner's argument, in summary, is that the payments on account of the guaranty were mere advances made by him to the other partners; that there was no closed and completed transaction in 1942 to permit his claim of a loss, and, consequently, that the "repayment" of the so-called advances in 1943 was not taxable income in that year, when the amount expended by him in 1942 because of inadequate profits from the partnership was recouped. We are unable to agree with petitioner's argument, both on the basis of the applicable principles of law and the pertinent facts involved. We perceive no error

---

[1] The word "guaranty" is used herein in its colloquial business sense and not as indicating that Curtis was a guarantor in the strict legal sense.

in the manner in which the "guaranty" payments were treated by him in 1942, when he claimed the loss, or in respondent's action in subscribing thereto. It, accordingly, must follow that the recoupment of the loss in 1943 resulted in taxable gain, as respondent has determined.

Contrary to petitioner's contention, we believe that the payments were not advances, or loans, or contributions to capital, but were payments required from him by the partnership agreement pursuant to which he was engaged in business. These payments resulted in a loss to petitioner, and the loss was sustained in 1942. Petitioner was not an ordinary surety underwriting the debt of another. He undertook an obligation that was his own, which he discharged by the payments to the other partners. Cf. *Howell* v. *Commissioner*, 69 Fed. (2d) 447. He had no right against these partners or anyone for repayment. The only manner in which he could ever hope to recoup the loss so sustained was by the continuance of the partnership business and its profitable operation. If the partnership profits in some future year should reach a certain amount, then the share distributable to him was to be increased by an amount equal to the expenditures which he had been personally required to make in a prior year. Whether petitioner could in the next year, or at some later time, or ever, be made whole was not reasonably ascertainable as of the end of 1942. At that time the amount of his loss resulting from the partnership business carried on under the partnership agreement requiring these payments was definite, fixed, payable, and fully paid, and the loss was then properly claimed by him for tax purposes, even though a possibility of recoupment existed—a possibility arising only out of the future profitable operations of the partnership and not as a claim of right *dehors* the business operation. Even if some claim of right for reimbursement could be said to have existed, in the absence of proof whatsoever on the point, we could not say, as we would have to, that the possibility was not remote, but substantial. Cf. *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398; *E. R. Hawke*, 35 B. T. A. 784; remanded without discussion of this point, 109 Fed. (2d) 946; certiorari denied, 311 U. S. 657. See 5 Mertens, Law of Federal Income Taxation ¶ 2810.

From the various agreements themselves, we discern that the parties did not conceive of the payments which petitioner might be required to make under the terms of the guaranty as advances or loans; nor were they apparently so intended. Such payments were identified as giving rise to a "loss," and by the supplemental agreement of May 1942 a specific method of possible recoupment was agreed upon. In the absence of this supplemental agreement, although petitioner might otherwise have recouped his loss, he would have had little, if anything,

to support the position he now urges. *William W. Vaughan*, 31 B. T. A. 548; reversed on another point, 85 Fed. (2d) 497; certiorari denied, 299 U. S. 606. We do not believe that the terms of that agreement can vary the result.

In a sense, petitioner seeks to have us disregard the annual accounting requirements of the income tax law, Internal Revenue Code, section 41, and apply a principle similar to that suggested in *E. B. Elliott Co.*, 45 B. T. A. 82. But as to that principle, the *Elliott* case did not survive *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281. *Baltimore Transfer Co. of Baltimore City*, 8 T. C. 1; *Bartlett* v. *Delaney*, 173 Fed. (2d) 535. Petitioner's position leaves him without explanation as to what the tax effects would have been if the partnership had fared no better in 1943 than in 1942, and petitioner were again called upon to meet the minimum guaranties. He boldly states that there still would be no occasion to report a loss in 1942, and suggests that perhaps there might have been a reportable loss in 1943 or at some later unspecified time. It is because of the real possibility of such an occurrence in 1943 and the unavailability of any reasonably determinable manner of dealing with such situation taxwise that the annual reporting system for income tax purposes is particularly applicable to the facts presented to us.[2] Cf. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359; *Heiner* v. *Mellon*, 304 U. S. 271.

Since petitioner's loss was reportable in 1942, it inescapably follows that his total distributable share of the partnership profits in 1943 is includible in his income for that year. Petitioner concedes that this result must follow if it is determined, as we have concluded, that there was a loss in 1942.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

OPPER, *J.*, dissenting: Petitioner's payment does not seem to me to be a deductible loss in 1942 in view of the possibility and indeed the probability of recoupment. For the payments he made he received a claim in the nature of subrogation to the rights of his partners in future earnings. At least that was the practical effect of the agreement. Until it was clear that this claim was worthless, I fail to see how a deductible loss was incurred; and, in fact, as of the end of the prior year it must have been evident that the firm's earnings were likely to be large enough to make that claim entirely collectible.

[2] "The intricacies of our taxing system based as it is on the theory of annual accountings as a basis for determining tax liability require a practical and at times an arbitrary determination as to the year of incurrence of loss as well as the year of receipt of gain." 5 Mertens, *op. cit., supra*, ¶ 2815.

Without too much concern about a case where a long period of time might elapse, it seems to me that here the prospects for future collection were so good at the end of the very year when the payment was made that no deductible loss could have resulted.[1]   It is conceded that that year is still open in this proceeding.   The consequence would be to eliminate the recoupment which was actually collected in the following year and which gives rise to the deficiency.

[1] "* * *   The statute was intended to apply not only to losses resulting from the physical destruction of articles of value but to those occurring in the operations of trade and business, where the business man has ventured on a course of action in the reasonable expectation that the promised conduct of another will come to pass   * * *   Only when events prove the prophesy to have been false can it be said that he has suffered   * * *   It may well be that he whose house has been burned has sustained a loss whether he knows it or not and may recover a tax paid in ignorance of that material fact.   But we cannot say that the merchant whose action has been based not merely on ignorance of a fact but on faith in a prophesy—even though the prophesy is made without full knowledge of the facts—can claim to have sustained a loss before the future fails to justify his hopes." *Llewellyn* v. *Electric Reduction Co.,* 275 U. S. 243, 246–247.

