**LONG CORPORATION**

v.

**The UNITED STATES.**

No. 116–59.

United States Court of Claims.

Jan. 12, 1962.

Randolph W. Thrower, Atlanta, Ga., for the plaintiff. George L. Cohen and Sutherland, Asbill & Brennan, Atlanta, Ga., were on the brief.

Eugene Emerson, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. James P. Garland and Philip R. Miller, Washington, D. C., were on the brief.

JONES, Chief Judge.

Plaintiff, Long Corporation, is a South Carolina corporation which has operated as a construction contractor since 1943. It files Federal income tax returns on the basis of a fiscal year ending March 31 and uses the accrual method of accounting, except that it uses the completed contract method of accounting with respect to long-term contracts. At all relevant times, plaintiff's stock (except for qualifying shares) was owned by L. D. Long, plaintiff's president.

In counts I and II of its petition, plaintiff sues to recover overpayments of income tax assessed for its 1952 and 1948 fiscal years, respectively. The tax payment involved in count I was occasioned by the Commissioner of Internal Revenue's refusal to allow a deduction, as an ordinary and necessary business expense or business loss, of plaintiff's excess of construction costs over the amount it received as the contract price for construction of an apartment building for its wholly-owned subsidiary. Count II is predicated upon plaintiff's contention that it should be allowed to carry back 1950 fiscal year losses attributable to assets acquired from another corporation which was merged into plaintiff on August 31, 1948. Plaintiff would use the carryback to offset pre-merger earnings (fiscal year 1948) of plaintiff's construction business. We will discuss the counts in reverse order.

### COUNT II

On August 31, 1948, Grove Realty and Investment Company, the stock of which was owned by Mr. Long, merged into plaintiff. The assets of Grove Realty (nominated "Grove Division" after the

merger) consisted principally of income-producing real estate.

After the merger, in fiscal year 1950, plaintiff suffered a net operating loss. This loss was attributable to the Grove Division's assets. Plaintiff contends that it is entitled to carry back this loss to offset profits made by its construction operations in 1948; that is, prior to the merger. This would reduce the total Federal income tax due for fiscal year 1948, and if allowed, plaintiff would be entitled to a refund of the consequent overpayment.

The defendant, in denying the availability of the claimed carryback (it should be noted that the Commissioner of Internal Revenue would allow the loss to be carried over to plaintiff's fiscal year 1952), relies primarily on the Supreme Court's decision in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957).

We have had occasion, recently, to consider that case in Wisconsin Central Railroad Co. v. United States, Ct.Cl., 296 F. 2d 750 (1961). As is relevant to the case at bar, we regarded the following as the Libson Shops rationale, quoting from the slip opinion in Wisconsin Central at page 6, 296 F.2d at page 754:

"The Supreme Court required that tax attributes of a pre-merger corporation could only be utilized to the extent that one could trace that corporation as a unit in the resulting enterprise. Even then the pre-merger corporation's losses could be used only to offset that unit's income *or, conversely, the unit's losses could be carried back only to offset the income of its pre-merger form.*" [Emphasis added.]

Although the italicized phrase above was not essential to the resolution of the issue in Wisconsin Central, we see no reason to depart from this interpretation of Libson Shops.

Plaintiff argues that a Treasury Regulation [1] promulgated under the Internal Revenue Code of 1954 would allow the carryback on the facts as presented here. Plaintiff suggests that because the provision granting a net operating loss carryback in the 1954 Code [2] is in words similar to the grant of section 122(b) (1) (A) of the Internal Revenue Code of 1939 [3] (pursuant to which plaintiff asserts its present claim), the regulation mentioned above should be authoritative in construing section 122(b) (1) (A).

We cannot agree. In the 1954 Code, the Congress reexamined its carryover and carryback policy in regard to corporate reorganizations. Section 381, in particular, expresses this policy by new and specific rules. Even assuming that the 1954 Code impliedly allows a carryback on facts as the plaintiff has proved, it certainly cannot be said that this is the interpretation that must be given a provision under the 1939 Code which was completely silent on the matter.

Even though the regulation cited may renounce the rule in Libson Shops as to this particular point, it is the Libson Shops case, not the regulation, which is applicable to plaintiff's tax years. That case adopts a "continuing enterprise" rather than a "strict entity" approach; and this test precludes plaintiff's use of the carryback.

Further, as we stated in Wisconsin Central (slip opinion, page 2, footnote 3, 296 F.2d page 751): "No inference is to be drawn from [the 1954 Code] as to whether tax attributes can be utilized by a successor corporation under pre-existing law. See Koppers Co., Inc. v. United States, 134 F.Supp. 290, 133 Ct.Cl. 22, 34 (1955)."

## COUNT I

 Prior to execution of the construction contract involved herein, plaintiff had transferred certain land to The Darlington, Inc., then a newly organized South Carolina corporation (hereinafter

1. Treas.Reg. § 1.381(c) (1)–1(b) (1960).
2. 26 U.S.C. (I.R.C.1954) § 172(b) (1) (1958 Ed.).

3. 26 U.S.C. (I.R.C.1939) § 122(b) (1) (A) (1952 Ed.).

called "subsidiary"), in exchange for all the common stock of the latter, except qualifying shares. One hundred shares of the subsidiary's preferred stock were issued to the Federal Housing Administration.

The FHA issued a commitment to insure a loan of $1,357,700 to be used to finance an apartment building on this land. A factor in determining the size of the loan was the FHA's estimate of the building and construction, and site improvement, costs as $1,159,676.

On December 7, 1949, plaintiff as contractor, and its subsidiary, as owner, executed an FHA form entitled: "Construction Contract—'Lump Sum.'" Pursuant thereto, plaintiff agreed to construct the apartment in accordance with FHA approved plans and specifications for a lump-sum price of $1,193,682.40. The contract price included construction and site improvement costs of $1,159,676, plus the contractor's fee of $34,006.40.

The evidence clearly indicates that this construction contract was intended to be the final agreement between the two corporations. However, Article 3 of the contract did make the lump-sum price subject to modification for "additions or deletions" agreed upon by the parties with the approval of the FHA. But, "it being understood that the [FHA] at all times has the right to require compliance with the original Drawings and Specifications."

After the contract was entered into, another experienced and reputable contractor offered to perform the contract in its entirety. The last of several offers to plaintiff by this contractor was some $10,000 below the lump-sum price for which plaintiff had agreed to perform the same work. Relying on the cost estimate by a competent estimator in plaintiff's employment, Mr. Long concluded that plaintiff could perform the contract and make a minimum profit of approximately 11 percent. The offer was therefore rejected.

Unfortunately, however, a prediction is only that. Unforeseen events, particularly war (the Korean) and weather, caused plaintiff's construction costs to exceed the contract price by $238,039.27.

In addition, the plaintiff, as contemplated by Article 3 of the contract, performed certain "extras" which were of a type normally anticipated in this type of construction. The net cost of this work —less than 5 percent of the contract price—did not exceed $55,808.74.

Representatives of the two corporations reasonably anticipated that the subsidiary would be able to arrange for an increase in its FHA-insured loan in an amount sufficient to pay plaintiff for the net cost of the extras, plus a reasonable profit. Accordingly, detailed records were kept to show the amount of extra work done by subcontractors; it was contemplated that the extra work done by plaintiff's own employees could be computed with reasonable accuracy at the completion of the contract.

The holder of the mortgage committed itself, subject to FHA approval, to increase the loan to the subsidiary by $75,000. This increase was intended to be a "round-figure," it being expected that the FHA would approve an increase only in an amount sufficient to cover the cost of the extras (as finally determined), plus a reasonable profit thereon.

Again the parties guessed wrongly. The FHA would approve a maximum loan increase of only $7,000. Delay and expense involved in changing the documents made it unwise to seek an increase of such a small amount.

Because the subsidiary did not have sufficient funds to pay for the extras, and because the FHA, before allowing final disbursement of the loan, required plaintiff and the subsidiary to certify that there were no unpaid obligations outstanding, Mr. Long decided that plaintiff would have to absorb all costs in excess of the contract price, including the net cost of the extras. The plaintiff's bookkeeper, however, allowed the cost of the extras to remain in construction costs, rather than making entries to show a capital contribution of this amount to the subsidiary. Mr. Long was not aware of this error. Except for this erro_, the

books of both corporations were kept in the same manner as they would have been if the parties had been unrelated companies, dealing at arm's length.

In its tax return for 1952 (fiscal year), plaintiff reported $1,193,682.40 of income from the construction contract. Plaintiff's argument, then, is that it should be allowed to deduct the excess cost ($238,039.27), excluding the extras, over the contract price as a loss for its fiscal year 1952. We agree. Cost of the extras is, however, admittedly a contribution to the subsidiary's capital for which no deduction is available.

Cases are legion which recognize the general principle that a taxpayer may organize his affairs as he chooses, but that if the form selected is a sham, the Government may disregard it. See, e. g., Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), Alpha Tank and Sheet Metal Mfg. Co. v. United States, 116 F.Supp. 721, 126 Ct.Cl. 878 (1953).

In determining whether or not the form used was one of substance, and not a sham, this court has closely scrutinized those transactions in which a common ownership factor was present. Our approach has been to ascertain whether the transaction was "one that could have reasonably been made between parties dealing at arm's length," and if it were, a business loss would be deductible. George E. Warren Corp. v. United States, 141 F.Supp. 935, 135 Ct.Cl. 305, 312 (1956).

Careful examination of the evidence in the case before us can lead to no other conclusion but that the excess cost was a bona fide loss incurred in performing a contract which was entered into for the purpose of making a profit. Plaintiff and its subsidiary have dealt with each other as if they were entirely unrelated corporations.

The FHA still regulates the rents the subsidiary may charge for the apartments, and those rents have never been increased beyond that originally specified so as to recoup the loss which plaintiff now claims on the construction contract. Only the construction contract price has been received by the plaintiff out of the proceeds of the FHA-insured mortgage loan. Other obligations discharged by payment of the loan proceeds were proper obligations of the subsidiary; no payment was made to discharge obligations incurred by plaintiff as contractor. That the contract price itself was fair and reasonable is substantiated by the FHA estimate and another contractor's willingness to perform the work at a figure substantially equal to that which plaintiff agreed to. Plaintiff has adequately explained why it decided to absorb the cost of the extra work rather than set up an accounts receivable. The remaining excess costs obviously had to be absorbed as the contract did not obligate the subsidiary to pay for them.

There is no question that there was a loss and that it was due principally to the Korean conflict. There is no doubt that if the contract had been let to an unrelated construction contractor, substantially the same loss would have been incurred for the same reason. Certainly the unrelated contractor could have deducted the excess cost thus occasioned as a business loss or expense.

Only if we were to hold that, as a matter of law, a loss is precluded whenever common ownership of transacting corporations is present, could we conscientiously uphold the Government's position. This is not the law. The separate entity concept must be recognized unless circumstances are present which make such recognition farcical.

Two cases cited by the defendant, Johnson v. Commissioner, 24 T.C. 107 (1955), aff'd, 233 F.2d 752 (4th Cir.), cert. denied, 352 U.S. 841, 77 S.Ct. 63, 1 L.Ed.2d 57 (1956), and V & M Homes, Inc. v. Commissioner, 28 T.C. 1121 (1957), aff'd, 263 F.2d 037 (6th Cir. 1959), illustrate the other side of the coin. The courts in those cases emphasized that the parties did *not* deal with each other as would unrelated parties acting at arm's length. They did not hold as a matter of law that related par-

ties could not so deal. It was recognized that an arm's length transaction could be possible, but that the burden of showing such had not been met. Plaintiff in the instant case has met this burden.

Since the plaintiff and its subsidiary must be regarded under the tax law as being separate and distinct entities, the defendant's argument that the excess costs (in so far as cost is a measure of value) was reflected in the value of the subsidiary's shares owned by plaintiff (and thus there was no economic loss) is not tenable.

Plaintiff's claim for refund under count II will be denied, with the petition as to this count dismissed. Its claim under count I will be granted.

Judgment will be entered for the plaintiff under count I with the amount of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

REED, Justice (Ret.), sitting by designation; DURFEE and LARAMORE, Judges, concur.