### INVESTORS DIVERSIFIED SERVICES, INC., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84357. Filed November 2, 1962.

*Kenneth M. Anderson, Esq.*, and *Joseph A. Maun, Esq.*, for the petitioner.

*Donald W. Geerhart, Esq.*, and *Willard J. Kiser, Jr., Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1954 and 1955 in the amounts of $364,706.59 and $314,565.30, respectively. Petitioner claims an overpayment of tax in the amount of $28,521.78 for the year 1955.

The issues for decision are:

(1) Whether Investors Diversified Services, Inc., sustained losses aggregating $1,307,886.60 on sales of mortgage loans to two wholly owned subsidiaries during the years 1954 and 1955.

(2) Whether such losses, if sustained, are deductible for Federal income tax purposes.

(3) Whether losses aggregating $102,467.66 sustained by Investors Diversified Services, Inc., on sales of mortgage loans to nonaffiliated vendees during the year 1955 are deductible as ordinary losses.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Investors Diversified Services, Inc. (formerly Investors Syndicate and hereinafter referred to as petitioner), is a Minnesota corporation having its principal place of business in Minneapolis, Minnesota.

Petitioner's Federal income tax returns for the years 1954 and 1955 were filed with the district director of internal revenue at St. Paul, Minnesota.

From its incorporation in 1894 until December 31, 1940, after the enactment of the Investment Company Act of 1940, petitioner was engaged in the business of issuing face-amount certificates. These certificates evidenced the obligation of petitioner to pay the holders thereof designated amounts upon maturity of the certificates and the agreement of petitioner to invest the amounts paid to it by the certificate holder in designated securities.

Petitioner discontinued the issuance of face-amount certificates on December 31, 1940, as it was financially unable to adjust its reserves to comply with the requirements of the Investment Company Act of 1940. However, petitioner had outstanding during the years here in issue face-amount certificates issued prior to December 31, 1940.

In 1940 petitioner organized as a wholly owned subsidiary, Investors Syndicate of America, Inc. (hereinafter referred to as I.S.A.), a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. I.S.A. met the investment requirements of the Investment Company Act of 1940 and has issued since its organization, face-amount certificates to the public.

During the years 1940 through 1955, I.S.A. had no personnel of any kind. Its entire operations were conducted and managed by petitioner. I.S.A.'s face-amount certificates were sold through petitioner's sales force. I.S.A.'s corporate officers were also officers of petitioner. I.S.A. utilized a portion of petitioner's offices and had no separate offices of its own. Three of I.S.A.'s eight directors were also on petitioner's board of directors.

Certain of the face-amount certificates issued by I.S.A. contained an "additional credits" provision. Such provision gave I.S.A.'s board of directors discretionary authority to determine additional credits in any amount for the accounts of the face-amount certificate holders. It further provided that no cash dividends could be distributed to I.S.A.'s stockholders in any calendar year unless an additional credit for each certificate in an amount equal to at least one-half of 1 percent of its surrender value was first determined by the board of directors.

On May 17, 1945, petitioner and I.S.A. executed an agreement providing, *inter alia*, that in consideration of stated fees to be paid by I.S.A., petitioner would have the sole and exclusive right to sell and distribute any and all investment certificates authorized or to be authorized and issued by I.S.A. The contract was for a 2-year term, terminable by either party on 60 days' notice thereof. Petitioner's income tax return for 1954 shows income from underwriting fees of $8,092,276.41.

Prior to 1940, petitioner had acquired as a wholly owned subsidiary a corporation organized and existing under the laws of New York, Investors Syndicate Title and Guaranty Company (hereinafter referred to as I.S.T. & G.). I.S.T. & G. sold face-amount certificates in the State of New York. I.S.T. & G. maintained offices in New York and had its own sales force through which its face-amount certificates were sold. Such certificates gave the holders thereof undivided interests in securities deposited with a designated trust company as a depository, a minimum return on such deposited securities,

and 60 percent of excess income from the securities above the minimum rate. During the years in issue four of I.S.T. & G.'s seven directors were also on petitioner's board of directors.

I.S.A. has never declared or paid a dividend to its stockholder. I.S.T. & G. has not declared or paid any dividends since 1953.

During the years here in issue, petitioner was engaged in developing and originating first mortgage loans on residential properties and other real estate, selling those loans to investors and the Federal National Mortgage Association, and servicing those loans for the account of the investors for the lifetime of the loans.

Petitioner sold mortgage loans either to its subsidiaries or to non-affiliated third parties in the following quantities and received therefor the following net proceeds during the 11-year period, 1948 through 1958, inclusive:

| Year | Number of loans sold | Net proceeds | Year | Number of loans sold | Net proceeds |
|---|---|---|---|---|---|
| 1948 | 8, 090 | $61, 721, 559. 94 | 1954 | 6, 458 | $59, 130, 185. 35 |
| 1949 | 10, 655 | 97, 563, 207. 66 | 1955 | 7, 241 | 74, 948, 929. 10 |
| 1950 | 16, 550 | 156, 611, 715. 39 | 1956 | 2, 858 | 31, 401, 215. 50 |
| 1951 | 13, 586 | 103, 164, 677. 63 | 1957 | 998 | 11, 928, 926. 17 |
| 1952 | 11, 586 | 74, 096, 120. 34 | 1958 | 73 | 1, 324, 850. 72 |
| 1953 | 11, 267 | 83, 405, 296. 86 | | | |
| | | | | 89, 362 | 755, 296, 684. 66 |

Since petitioner, I.S.A., and I.S.T. & G. were all registered investment companies, the Investment Company Act of 1940 prohibited the sale of mortgages by petitioner to either subsidiary. However, sections 6 (c) and 17 (b) of that Act empowered the Securities and Exchange Commission (hereinafter referred to as the SEC) to issue exemption orders permitting sales of investments between affiliated persons upon the basis of a finding that it was in the public interest and the interest of investors to do so.

On December 26, 1940, petitioner filed an application with the SEC for an exemption order permitting the sale of certain mortgages by petitioner to I.S.A. The terms of sale proposed in this application included a provision for an initial fee or premium to be paid by I.S.A. equal to "1½% of the principal amount of the loan and mortgage involved in the transfer, or the cost thereof to the parent, Investors Syndicate, [petitioner] if acquired at a discount."

In an affidavit attached to this application, petitioner represented to the SEC that the purpose of the proposed 1½ percent premium was merely to reimburse petitioner for its costs of originating the mortgages and that I.S.A. would be compelled to pay a premium of 2½ percent to 3 percent if it undertook to buy similar mortgages on the open market. This representation was subsequently repeated in an-

other affidavit dated December 19, 1945, submitted by petitioner to the SEC.

Pursuant to petitioner's application, an order exempting sales of certain mortgages by petitioner to I.S.A. from the prohibition of sections 17(a)(1) and 17(a)(2) of the Investment Company Act of 1940 was granted to petitioner by the SEC under date of November 13, 1941. This exemption order contained, *inter alia*, the following provisions:

1. Investors Syndicate shall not sell to Investors Syndicate of America, Inc., nor shall Investors Syndicate of America, Inc. purchase from Investors Syndicate any loan secured by mortgage or other first lien on real estate except at a price equivalent to the unpaid principal amount of such loan at the date of sale or purchase or the cost of such loan to Investors Syndicate, whichever is less, plus the fees and servicing charges permitted by paragraph 5 hereof; * * *

*    *    *    *    *    *    *

5. Investors Syndicate of America, Inc. shall neither make any payment nor be subjected to any fees, commission charges, costs or expenses by Investors Syndicate or any affiliated person thereof on account of any such mortgage transaction or the servicing of any such mortgage or mortgage loan or other lien, exclusive of costs, disbursements and expenses exempted by this order, except (a) an amount which may be charged by Investors Syndicate as a single premium payable at the time of transfer or sale, not to exceed 1½% of the principal amount of the loan and mortgage involved in the transfer, or of the amount of the investment therein by Investors Syndicate if acquired at a discount, whichever is the lesser amount; (b) a charge made each calendar month by Investors Syndicate to Investors Syndicate of America, Inc., of not to exceed 1/24 of 1% of the principal balance on the first day of such month of each loan and mortgage or other first lien on real estate serviced by Investors Syndicate for Investors Syndicate of America, Inc.; and (c) any expenses or disbursements incident to foreclosure of such mortgage or other obligation which is the subject hereof; * * *

The identical terms and provisions of the 1941 exemption order were repeated in exemption orders dated January 5, 1944, and March 1, 1946.

The March 1, 1946, exemption order was amended by orders dated December 23, 1946, and September 22, 1947. The sole purpose of such amendments was to extend the exemption to mortgages insured by the Veterans' Administration (hereinafter referred to as VA mortgages). The March 1, 1946, exemption order, amended in this single respect, remained in effect throughout the years 1954 and 1955.

Under date of August 1, 1942, petitioner and I.S.A. entered into an agreement establishing the prices at which mortgages would be sold by petitioner to I.S.A. in the future. The agreement provided that the mortgages shall be sold to I.S.A. at the principal amount of the loan and mortgage involved in the sale, or the amount of the investment therein by petitioner at the time of sale, whichever is the lesser amount, plus any accrued interest thereon and plus a premium of

1½ percent of such principal amount or petitioner's investment therein, whichever is less.

During the years 1948 through 1955 petitioner sold mortgages to I.S.A. and I.S.T. & G. as follows:

| Year | I.S.A. | | I.S.T. & G. | |
|---|---|---|---|---|
| | Number of loans | Net proceeds | Number of loans | Net proceeds |
| 1948 | 4,987 | $34,730,000 | 677 | $4,378,000 |
| 1949 | 4,077 | 33,528,000 | 580 | 4,186,000 |
| 1950 | 6,733 | 56,452,000 | 656 | 4,834,000 |
| 1951 | 5,766 | 32,472,000 | 421 | 2,970,000 |
| 1952 | 8,423 | 47,784,000 | 424 | 2,549,000 |
| 1953 | 8,169 | 57,059,000 | 266 | 2,134,000 |
| 1954 | 5,924 | 53,531,000 | 226 | 2,104,000 |
| 1955 | 6,366 | 68,520,000 | 349 | 3,153,000 |

During the 1940's petitioner was under nearly constant investigation by the SEC. In the early 1940's the SEC questioned some of petitioner's practices in connection with the promotion and sale of face-amount certificates issued by I.S.A. and I.S.T. & G. These investigations resulted in the entry of a consent decree which provided for control of petitioner by trustees approved by the SEC. This trusteeship lasted approximately 3 years.

In the latter part of the 1940's and throughout the years here in issue petitioner entered into arrangements with builders which it referred to as participation projects. A participation project was generally a housing project wherein petitioner agreed to finance acquisition of raw land, the construction of houses, render other services in connection with the development, and take mortgages on the individual properties sold out of the project, in exchange for an interest in the profits realized on the development of the raw land into a subdivision of homes. Petitioner sometimes would organize a wholly owned subsidiary to be the builder in its participation project. In other instances petitioner's share of the profits would be in the form of a stock interest in the builder, usually 49 percent, or a contractual right to receive a certain share of the builder's profits.

Besides an interest in the profits of the builder, petitioner also derived income from the participation projects from interest on the mortgage construction loans, fees for making the permanent loans, commissions on fire and casualty insurance on the properties, and fees from the servicing of the mortgages sold.

A mortgage construction loan fee is a fee or discount charged a builder for the mortgagee's services in handling a temporary construction loan. This fee or discount is not related to the permanent loans later placed with respect to the individual homes sold by the builder

out of his project. The average duration of a construction loan is between 8 and 15 months.

During the period 1948 through 1955 the selection of the mortgages sold by petitioner to I.S.A. and I.S.T. & G. was made by Francis C. Haas, petitioner's assistant vice president in charge of mortgage servicing operations, mortgage department. In this capacity Haas worked with petitioner's management to take care of I.S.A. requirements.

Haas was under instructions from petitioner's management to take care of I.S.A.'s requirements before any mortgages were sold to nonaffiliates. In accordance with those instructions Haas prepared an inventory of mortgages for sale and constantly checked it against the inventory of mortgages held by I.S.A. Petitioner's treasury department had the responsibility of constantly analyzing I.S.A.'s cash flow and keeping Haas informed as to what sums I.S.A. had available for mortgage investments. On the basis of such information Haas would determine exactly what mortgages should be sold to I.S.A. to maintain the latter's minimum obligations in the various States in which it sold face-amount certificates.

During the years here in issue and all prior years, petitioner held some of the mortgages which it originated as security for its outstanding face-amount certificates which it had issued prior to December 31, 1940.

Mortgages in excess of petitioner's investment needs were sold as rapidly as possible so as to enable petitioner to originate more mortgages. During the years 1954 and 1955 most of the mortgages assigned by petitioner to I.S.A. had been held by petitioner for not more than 3 or 4 months after origination.

During the years 1952 and 1953 petitioner sold mortgages to I.S.A. charging the 1½ percent premium allowable under the SEC exemption order. At this time petitioner was selling mortgages to third parties at greater premiums. The sales were made to I.S.A. because I.S.A. had no mortgage department, and petitioner did not want I.S.A.'s funds to be idle.

I.S.A. and I.S.T. & G. derived other advantages from their mortgage dealings with petitioner. They had a larger selection of mortgages to choose from than could have been offered by nonaffiliates. They were enabled to invest their surplus funds immediately and thus avoid any loss of interest. Their investment requirements were checked and fulfilled by petitioner's personnel. If petitioner's subsidiaries had purchased their mortgage requirements from nonaffiliates, they could not have put their cash flow to work as rapidly or in mortgages of equal investment yield as they did with their mortgage requirements being supplied by petitioner.

On or about December 1, 1953, petitioner ceased charging any premium on mortgages sold to I.S.A. and I.S.T. & G. During December of 1953 and the first 2 months of 1954 all mortgages which petitioner sold to I.S.A. and I.S.T. & G. were priced at their remaining unpaid principal balance. Throughout the balance of 1954 and all of 1955 petitioner sold mortgages to both I.S.A. and I.S.T. & G. at less than the amount of the remaining unpaid balance thereon or the amount which petitioner had advanced to the mortgagor in originating the mortgage less payments made by the mortgagor on the principal of the loan.

Commencing in or about August of 1953 petitioner instituted a policy of determining for each participation project at the date of petitioner's entry into such project an amount which in the judgment of its mortgage committee and other officials represented the fair market value for mortgages in the area in which the participation project was located at the time the project was started based on current market conditions. Petitioner computed the percentage that the fair market value so determined bore to the face amount of the mortgage and set up the difference between the two amounts as a discount rate on the mortgage even though petitioner advanced to the mortgagor the face amount of the mortgage. This discount rate so computed, after a 50-percent reduction to take into account additional income tax liability which would have resulted from additional profits, was applied to each of the permanent mortgage loans emanating from the project by means of a credit to a deferred income account which was then amortized, for book purposes but not for tax purposes, over the life of the mortgage to which such credit entry pertained.[1] When the permanent mortgage loan was later sold to I.S.A. or I.S.T. & G. the selling price was determined by subtracting the unamortized portion of the

---

[1] The record is not clear for whose income tax liability the 50-percent reduction compensated. One of petitioner's witnesses testified that the 50-percent reduction was to take into account the taxes paid by the subsidiary corporate builder on the increased profits caused by petitioner's funding the mortgages at par without charging the subsidiary a fee. It would appear that in a wholly owned subsidiary situation petitioner might very well, when setting a valuation for mortgages originated, take into account the fact that the income of the subsidiary had been increased by the amount of the fees (which as hereinafter stated it was a customary practice to charge when a mortgage was funded at par when the market was less than par, but which petitioner did not charge the builders in its participation projects) the subsidiary did not have to pay petitioner and that such increase in income to the subsidiary was, in turn, subject to a 50-percent reduction for taxes which affected the amount that petitioner would ultimately derive from the subsidiary. However, no explanation is made as to why the reduction was 50 percent with respect to participation projects in which petitioner was only a part owner in the builder or had only a contractual interest in the earnings of the builder if, in fact, any of the mortgages here involved were originated from such projects. If petitioner funded mortgages at par when the mortgage market was less than par without receiving a fee therefor, petitioner was, in effect, forsaking income in the form either of a fee from the builder or of interest from the mortgagor, which income would have been subject to tax if it had been received by petitioner. No such explanation for the 50-percent reduction of the computed discount was made in the record.

computed discount for that mortgage from its unpaid principal balance at date of sale.

Petitioner originated the permanent mortgages at par which amount petitioner treated as its cost basis for tax purposes. Petitioner computed losses for tax purposes based on the difference in its cost basis as computed for tax purposes and the sales price to the subsidiary, which price was arrived at by subtracting from the unpaid principal balance of the mortgage the unamortized portion of the computed discount. The losses so determined constitute $1,052,191.87 of the total $1,307,866.60 deductions for losses on mortgages sold to its subsidiaries claimed by petitioner for the 2 years here in issue.

The permanent or individual mortgages were usually originated by petitioner between 6 months and 2 years after its entry into the participation projects involved.

At all times material hereto it was customary for a lender to charge the seller a fee for originating a permanent mortgage whenever the mortgage market was below par. The purpose of such fee was to compensate the lender for the discounted market value of the mortgage. Petitioner never charged any such fee to the seller, or builder, when the mortgage was originated as part of a participation project.

The state of the mortgage market at any particular time had little influence upon petitioner's decision to enter into a particular participation project. The principal incentive for entry into such projects was the overall income to be derived therefrom.

In accordance with the terms of the 1946 SEC exemption order petitioner filed semiannual reports with the SEC for the years 1954 and 1955. Such reports disclosed that the price charged I.S.A. on each mortgage purchased by it from petitioner during the years 1954 and 1955 was not less than the cost thereof to petitioner.

The SEC has never been advised by petitioner, either formally or informally, as to the latter's interpretation of cost for purposes of the 1946 exemption order.

FNMA was established by Congress to create a secondary mortgage market. FNMA was authorized to enter into commitment contracts with mortgagees under the terms of which FNMA would agree to purchase mortgage loans in the future at stated prices, known as commitment prices. The term of the commitment contract was not more than 28 months. During years prior to 1954 the maximum FNMA commitment price was par; in some instances it dropped as low as a 5-percent discount. In the usual case FNMA commitment prices reflect prevailing mortgage market values.

Under date of October 1, 1953, FNMA awarded a commitment contract to petitioner in consideration of a fee of one-half of 1 percent of the original principal amounts of the mortgages covered there-

under. Under the terms of that contract FNMA agreed to purchase at par mortgages in the aggregate principal amount of $3,466,850. Such mortgages bore an interest rate of 4½ percent.

Throughout the period from 1948 through 1954 the mortgage market fluctuated from month to month. The market price of mortgages also varied for mortgages on real property located in certain sections of the country as compared to others and for mortgages bearing different interest rates and for shorter or longer terms. In the late spring or early summer of 1953 the mortgage market generally throughout the country fell below par.

Petitioner sold a total of 307 mortgages in 1954 to nonaffiliated third parties for an aggregate price of $6,879,671.13. All of these mortgages were sold at par; 304 of the mortgages, most of them bearing an interest rate of 4½ percent, were sold to FNMA under a prior commitment to purchase at par. One was purchased by the Veterans' Administration in lieu of foreclosure. The other two loans, also bearing a 4½ percent interest rate, were made by petitioner as accommodations for others and were purchased by two insurance companies.

In 1955 petitioner sold a total of 526 mortgages to nonaffiliates receiving an aggregate amount therefor of $3,275,134.77. Twenty-eight of the mortgages were sold to FNMA, the balance were sold to various banks and insurance companies. All but one of the mortgages were either fully insured by the Federal Housing Administration (hereinafter referred to as FHA) or was a VA fully or partially guaranteed loan. All the mortgages bore an interest rate of either 4, 4¼, or 4½ percent. Forty-seven of the mortgages bore an interest rate of 4½ percent. Of these, 41 were sold at par and 6 at a 1-percent discount. Eight mortgages bore an interest rate of 4¼ percent. These mortgages were sold at a 1-percent discount. The remaining 471 mortgages bore a 4-percent interest rate. These mortgages were sold mostly for discounts ranging from 2 to 5⅛ percent.

The interest rate on FHA and VA insured mortgages of the type usually originated by petitioner was increased to 4½ percent effective in May 1953.

Guaranteed mortgages have always generally carried a lower interest rate than conventional mortgages. The VA and FHA guarantees have some value to a mortgagee and to a degree offset the higher conventional interest rates. Some mortgagees prefer a fully guaranteed 4½-percent FHA loan over a 5-percent conventional loan for investment purposes.

During the years 1949 through 1955 petitioner was endeavoring to increase its mortgage sales to nonaffiliates. Sometimes, when necessary to satisfy the mortgage demands of such nonaffiliated customers, petitioner would include in the mortgage loans offered such customers a bundle of mortgages previously sold by it to I.S.A.

During the years 1954 and 1955 petitioner voluntarily refunded to I.S.A. $301,382.81 in premiums received on mortgage sales to that subsidiary in prior years. No monetary consideration for such refunds was received from I.S.A. The following table shows the source and amount of the premiums refunded to I.S.A. by petitioner during the years 1954 and 1955:

| (1) | (2) | (3) | (4) |
|---|---|---|---|
| Period in which refunded | Principal balance of mortgages at time of sale to I.S.A. | Premiums charged I.S.A. on mortgages shown in col. (2) | Portion of premiums (unamortized) refunded to I.S.A. |
| 1954: | | | |
| Jan.–June | $51,012.00 | $765.18 | $732.88 |
| July–Dec. | 10,673,270.89 | 163,099.06 | 115,071.94 |
| 1955: | | | |
| Jan.–June | 9,511,629.53 | 142,630.00 | 87,968.46 |
| July–Dec. | 10,980,411.83 | 164,709.00 | 97,609.53 |
| Total | 31,416,324.25 | 471,203.24 | 301,382.81 |

Included in the losses claimed by petitioner on mortgage sales were the sums of $127,300 in 1954 and $128,394.73 in 1955 which represent claims of losses on sales to I.S.A. of mortgages originating from loans made by petitioner on houses in a project known as the Telesyndicate project.

The Telesyndicate project loans had been originated by petitioner in 1950. The seller of these homes was not an affiliate of petitioner and this project was not one of petitioner's participation projects. The mortgages received by petitioner from the Telesyndicate project were to secure conventional loans bearing 5-percent interest. At the time petitioner originated the Telesyndicate loans it received a fee averaging approximately 9½ percent of the face amount of the loans which it included in its income for the year 1950 in computing its Federal income tax. Petitioner when it entered the principal amounts of these mortgage loans on its books set up a credit to a deferred income account entitled, "Deferred Income, Mortgage Construction Loan Fees" in approximately the amount of 9½ percent of the face amount of the mortgages. The account was amortized over the life of the mortgages to which it pertained. When the Telesyndicate mortgages were sold to I.S.A. in 1954 and 1955, petitioner determined their selling price by subtracting the unamortized portion of this deferred income account from the remaining unpaid principal balance of the loans.

Petitioner incurred a loss of $102,467.66 in 1955 on sale of mortgages to nonaffiliated third parties which was shown in its annual report to stockholders for that year under the heading "gain or loss on investment transaction." The loss was reported on petitioner's 1955 Federal income tax return as a capital loss.

During the years 1946 through 1953 petitioner and its wholly owned subsidiaries filed consolidated Federal income tax returns. On these consolidated returns for the years 1948 through 1953 the entire gains derived by petitioner from mortgage sales to nonaffiliates were reported as capital gains. During the years 1941 through 1947 such gains were reported on petitioner's income tax returns or its consolidated returns as ordinary income.

On its Federal income tax returns for the years 1954 and 1955 petitioner claimed deductible ordinary losses in the respective amounts of $701,358.84 and $606,527.76 for the losses arising out of the mortgage sales to I.S.A. and I.S.T. & G. in those 2 years.

In his notice of deficiency for 1954 respondent stated:

(f) On a separate schedule of "costs and expenses" attached to your return you claimed deductions of $670,622.09 as a "loss on sale of mortgages to ISA.," and $30,736.75 as a "loss on sale to I.S.T. & G. Co.," a total of $701,358.84. It is determined that such claimed losses totaling $701,358.84 and here identified as "loss from the sale of mortgages to subsidiaries" is disallowed because you have failed to establish your right to such a deduction.

Respondent's explanation of his determination for 1955 is similar.

Petitioner in its petition alleged that it erroneously reported its losses on sales of mortgages to nonaffiliates in the year 1955 as capital losses, that these losses in the amount of $102,467.66 constitute ordinary losses deductible in full in computing its taxable income and that it has overpaid its income tax for the year 1955 by the amount of $28,521.78. Respondent denied that petitioner erroneously reported its losses on sales to nonaffiliates as capital losses and that petitioner had overpaid its income tax for the year 1955.

OPINION.

The primary issue involved in this case is whether petitioner is entitled to deduct the amounts of $701,358.84 and $606,527.76 in the years 1954 and 1955, respectively, which it claimed on its income tax returns as losses on sales of mortgages to its two wholly owned subsidiaries. It is petitioner's position that since these amounts represent the difference in its basis in these mortgages for income tax purposes and the sales prices received therefor from its subsidiaries, they constitute losses for income tax purposes which are deductible as ordinary losses since they arose from the sale of property held primarily for sale to customers in the ordinary course of its trade or business. Petitioner takes the position that even though the sales were to its wholly owned subsidiaries, the transactions were real, made in the ordinary course of business for a fair consideration, and should therefore be recognized for Federal tax purposes.

Respondent in his argument separates the amounts claimed as losses into two categories. He addresses certain arguments to his

disallowance of deduction of the losses claimed on sales by petitioner to its subsidiaries of mortgages which petitioner originated in its participation projects which account for $574,058.84 and $478,133.03 of the claimed losses in the years 1954 and 1955, respectively. Respondent makes somewhat different contentions in support of his position that petitioner is not entitled to its claimed deductions for the losses in the amount of $127,300 and $128,394.73 for the years 1954 and 1955, respectively, which petitioner shows as sustained on the sale of the Telesyndicate mortgages to I.S.A.

It is respondent's position with respect to the mortgages originated by petitioner from participation projects that the cost of such mortgages to petitioner did not exceed the fair market value of such mortgages at the time of their origination since any excess of the amount advanced on such mortgages over the fair market value thereof is in the nature of a capital contribution by petitioner in the participation projects and would go to increase the cost basis of petitioner's stock or other interest in such project. Respondent argues, in the alternative, that if the cost of the mortgages to petitioner is considered to be an amount in excess of the fair market value of such mortgages at the date of origination, petitioner has not shown that the sale to its subsidiaries was at the fair market price of the mortgages at the date of the sale, and, therefore, has failed to show that any loss resulting from such sale should be recognized for Federal tax purposes. Respondent also argues, in the alternative, that any sale of these mortgages by petitioner to its subsidiaries at a loss was in violation of the requirements of the SEC exemption order, and the losses arising from this violation should not be allowed as income tax deductions since such an allowance would frustrate clearly defined public policy.

It is too well settled to require citation of authority that in order for petitioner to be entitled to the deduction for losses which it claims, it is necessary that it establish the facts to support such claimed deductions. Petitioner, in its effort to carry this burden, has shown that the amounts of the deductions claimed by it represent the difference in the amounts it funded to the mortgagors in connection with the mortgages subsequently sold, reduced by payments on principals of those mortgages, and the amounts of sales price which it charged its subsidiaries for such mortgages.

Had these mortgages been originated by petitioner in connection with projects which it financed for a totally unrelated builder in an arm's-length transaction and had the subsequent sales of the mortgages been made to an unrelated party in an arm's-length transaction, this evidence might be sufficient to show that petitioner did, in fact, sustain the claimed losses. However, the facts here show that the mortgages were originated under commitments given by petitioner to

affiliated builders, some, or insofar as the evidence here shows all, of which were petitioner's subsidiary corporations in which it owned 100 percent of the stock, and the sales were made to its wholly owned subsidiaries. Transactions of this nature require special scrutiny to determine if they are sufficiently real and negotiated on a sufficiently fair basis to be treated, in determing the tax consequences, as if they constituted arm's-length transactions.

One of the basic criteria in determining the recognition to be given to transactions between a corporation and its wholly owned subsidiary is whether the consideration that passed between the two is comparable to the consideration which would have passed had the parties been unrelated. Judged by this standard, the evidence here fails in many particulars to support the claimed deduction. Viewing, first, the acquisition of the mortgages by petitioner, the evidence shows only a determination by petitioner of the fair market value of mortgages comparable to those which it was committing itself to make at the date of the commencement of the participation project and does not show the fair market value of mortgages at the date petitioner made the mortgage loan to the individual home buyers. The evidence shows that between the date of commitment as of which petitioner determined the fair market value of the mortgages and the date of the making of the loans to the individual home buyers, a period of from 6 months to 2 years elapsed. The evidence further shows that the mortgage market varied from month to month, and the logical inference from these two established facts in the record is that it would be the sheerest of coincidence if the fair market value of the mortgage at the date petitioner entered into a participation project and the date that petitioner advanced the funds to the purchaser of a completed home in that project were the same.

The evidence shows that the customary practice in the mortgage financing business was for a builder who obtained an agreement from a lender that the lender would supply funds to purchasers of his houses sold under FHA and VA mortgages where by law the face amount of the mortgage was required to be advanced to the purchaser, to pay the lender a fee when the fair market value of the mortgage at the date the funds were advanced to the home purchaser was less than the face amount of the mortgage to compensate for this differential in value. The only explanation in the record in the instant case of why this custom was not followed by petitioner, if in fact the fair market value of the mortgages was under the face value thereof at the time petitioner supplied the funds to the purchaser of the houses in the participation projects, is that petitioner was entitled to receive in full or in part the profits of the builder, either because that builder was a wholly owned subsidiary of petitioner, a corpo-

ration in which petitioner had a substantial stock interest, or a builder with whom petitioner had a profit-participation contract.

While petitioner refers to other forms of income that it hoped to derive from the participation contracts such as fees on construction loans, interest on permanent mortgage loans, servicing fees on permanent mortgage loans, insurance fees with respect to the mortgaged property, and gain on the sale of mortgages, there is nothing in the record to indicate why these same sources of income would not have been available to petitioner had it agreed with totally unrelated builders to finance the construction and sale of homes which they were proposing to build. Stripped to its barest essentials, petitioner's explanation amounts to a statement that since it was to receive the profits of the builder, it was unimportant whether it obtained from that builder the normal fee incident to funding at face value a mortgage for a house purchased, thus increasing its own income by the amount that the builder's income was decreased, or left this potential source of income with the builder to be taken by petitioner at a later date as a part of that builder's profits. It is in this connection that the failure of the evidence to show to what extent petitioner owned the stock of the builders of the houses on which the mortgages involved in this case were made, or if these mortgages were in respect to projects where petitioner had a contractual right to participate, what percentage of the profits petitioner was to receive, becomes important.

Petitioner argues that because of the extremely large number of mortgages involved in the transactions here in issue, it was not practicable to produce evidence showing the extent of its ownership of or the percentage of profits it was to receive from the builder of each of the houses on which mortgages were originated. It is, however, immediately apparent that when these houses were built by wholly owned subsidiaries of petitioner, the taking by petitioner of the customary fee for funding a mortgage at par when the fair market value of such mortgage was less than par, would be of little concern to petitioner except for its possible tax effects. In any event since the evidence does show that petitioner, to whatever extent it might have funded mortgages at par when the fair market value was less than par, did forego the taking of a fee which customarily would have been taken by a lender unaffiliated with the builder, the transactions between petitioner and its affiliated builders are not arm's length.

Had petitioner charged the builders the ordinary fee for funding mortgages at amounts in excess of the fair market value of the mortgages and included such fees in its taxable income for the year in which the mortgage was originated, its basis in the mortgage for tax purposes might have been the face value of the mortgage, as it argues.

However, under these circumstances petitioner would have received and included in its income the fee which it received in compensation for funding the mortgage at an amount in excess of its fair market value.

For this reason the situation here is quite comparable to those cases relied upon by respondent where amounts in excess of market value are paid for purposes other than the acquisition of the property itself, and the property so acquired has been held to take as its basis its fair market value at the time of acquisition. Cf. *Mountain Wholesale Co.*, 17 T.C. 870 (1951); *New Hampshire Fire Insurance Co.*, 2 T.C. 708 (1943), affd. 146 F. 2d 697 (C.A. 1, 1945); *Majestic Securities Corporation*, 42 B.T.A. 698 (1940), affd. 120 F. 2d 12 (C.A. 8, 1941). Viewed in this light petitioner's cost of the mortgages would be their fair market value at the date they were originated. The fee which petitioner chose to forego would be, as respondent contends, in the nature of a capital investment in its affiliated builders in whose profits it had an interest.

The situation here is further complicated by the fact that for the year 1953 when some of the mortgages sold in 1954 and possibly some of those sold in 1955 might have been originated, petitioner and its wholly owned subsidiaries filed consolidated returns. If the fees that petitioner chose to forego were fees which would have been paid to petitioner by a subsidiary whose income was combined with petitioner's in 1953, it might be that the foregoing of the fee had no tax effect.[2] Petitioner has offered no evidence to show whether this was the situation. Speculation cannot substitute for this deficiency in proof by petitioner.

The evidence here is totally deficient in a further particular. The evidence shows that petitioner's sales of mortgages to its subsidiaries, I.S.A. and I.S.T. & G., were generally made approximately 3 or 4 months after petitioner originated the mortgage. Since petitioner's commitments in participation projects were given usually at least 6 months before any mortgage loans to house purchasers were made, this would mean that the fair market value of the mortgages used by petitioner in computing sales price to I.S.A. and I.S.T. & G. was a value determined as of a time at least 9 or 10 months, and quite likely longer, before the date of the sale. There is no evidence to sustain petitioner's contention that the amount it charged its subsidiaries for these mortgages was their fair market value at the date of the sale of the mortgages to its subsidiary as distinguished from what might have been the fair value of comparable mortgages 9 or 10 months

---

[2] An exhibit offered by respondent shows one mortgage of $11,600 originated on October 1, 1953, and one of $11,000 originated on November 7, 1953, sold by petitioner to I.S.A. in 1954. The other mortgages shown on this exhibit had originated after January 1, 1954. The exhibit does not show all the mortgages sold by petitioner to I.S.A. in 1954 and 1955 nor petitioner's interest in the building of the houses covered by the mortgages.

prior when petitioner entered into the participation project with the builder.

The evidence is clear that, except to the extent that it was required to comply with SEC regulations in its transactions with its subsidiaries, petitioner completely controlled the subsidiaries through ownership of stock, management contracts, and the same officers. Under such circumstances, the sales of the mortgages by petitioner to these subsidiaries require special scrutiny to determine whether they were made on a basis comparable to transactions which might have been entered into with an unrelated party. Petitioner argues that the sales were at "cost" to it within the meaning of the SEC exemption order since that order was not intended to require it to sell to its subsidiaries at a price in excess of fair market value and the price fixed by petitioner to be paid by the subsidiaries was the fair market value at the date of the sale or in excess of such fair market value. The evidence fails to support this contention. Other than unsupported statements of opinion of two witnesses offered by petitioner, the only evidence which is in the record with respect to the fair market value of the 4½ percent FHA and VA mortgages, which the evidence tends to indicate were those which were sold at the claimed losses here involved, with the exception of the Telesyndicate mortgages, shows that such mortgages were not selling at discounts at the dates of petitioner's sales to I.S.A. and I.S.T. & G. The evidence of the commitment by FNMA to purchase such mortgages at par, requiring only one-half of 1 percent for entering such commitment, and the few sales of 4½ percent VA and FHA mortgages made by petitioner to nonaffiliates during the years here involved, tends to indicate that at the time these mortgages were sold the market for mortgages of this type was approximately par, and even 4-percent mortgages appear to have been selling in some instances at par in 1954 but not in 1955. In any event, the evidence fails to establish that the fair market value of any mortgage sold by petitioner to I.S.A. or I.S.T. & G. was less than par at the date the sale was made. The sales by petitioner to the subsidiaries at amounts set by it at less than petitioner's cost basis in the mortgages for income tax purposes have not been shown to be arm's-length transactions, but the inference from the lack of contrary evidence is that the sales prices were set for the purpose of shifting income from petitioner to the subsidiary corporations. Cf. *Irving R. Lewis*, 19 T.C. 887 (1953).

Petitioner relies upon *McMillan Mortgage Co.*, 36 T.C. 924 (1961); *Commissioner* v. *Bagley & Sewall Co.*, 221 F. 2d 944 (C.A. 2, 1955), affirming 20 T.C. 983 (1953); and *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955). In these three cases the taxpayers as a part of a transaction arising directly out of their trade or business were required to purchase assets which usually are capital assets. The

taxpayer in *McMillan Mortgage Co.*, *supra*, in order to obtain a commitment from FNMA to purchase its mortgages, agreed to purchase capital stock in FNMA which in effect was an agreement to accept such stock in partial payment for its mortgages. Cf. *Ancel Greene & Co.*, 38 T.C. 125 (1962). In *Commissioner* v. *Bagley & Sewall Co.*, *supra*, the taxpayer as part of a contract for the manufacture and sale of paper machinery was required to purchase Government bonds to be held in escrow to guarantee performance of the contract. In *Tulane Hardwood Lumber Co.*, *supra*, the taxpayer purchased debentures of a supplier so as to have available a source of supply for its business. In each instance the security acquired was held not to be a capital asset and the loss on disposition or worthlessness was held to be a deductible business expense. Each of these cases is distinguishable from the instant case. Each of them involved unrelated parties dealing at arm's length. The purchase was a business necessity, and the taxpayer had no proprietary interest in the person from whom the asset was purchased so as to be in a position to profit by that person's receiving an excessive price for the asset. Petitioner, the purchaser of the asset in the instant case at a claimed excessive price, was the owner of the right to receive some or all of the increased profits of the builder whose profits were increased by the excessive payment.

The amounts of $127,300 and $128,394.73 for the years 1954 and 1955, respectively, of the losses claimed by petitioner, were from the sale of the Telesyndicate mortgages to I.S.A. These mortgages were originated by petitioner in the latter part of 1950 and did not arise out of participation projects, but rather were conventional 5-percent loans made on houses or housing units already in existence.

Respondent does not contend as to these mortgages that any part of the amount paid therefor should be allocated to something other than the mortgages themselves. However, respondent argues that the record fails to show that petitioner paid more for the mortgages than the amount it received on the sale to I.S.A.

We have found as facts that petitioner funded the mortgages at par and received a fee at origination equal to approximately 9½ percent of the principal or face amount of the mortgage and that this fee was taken into income for tax purposes in the year of receipt. Respondent vigorously contends that these mortgages were funded by petitioner at a discount and there is some reference in the testimony to discounts on these mortgages; but considering all the evidence, we have found the facts to be, as petitioner contends, that it received a fee for funding the mortgages at par and included this fee in its income for tax purposes in the year of its receipt. Petitioner on its books placed the fee received and reported as income in a valua-

tion reserve account which it amortized over the life of the mortgage for its book accounting purposes but not for income tax purposes. The price which petitioner charged to I.S.A. on the sale of the mortgages was the unpaid balance thereof less the unamortized portion of the book valuation reserve. By so computing the price to I.S.A. petitioner sold the mortgages to I.S.A. at amounts less than its basis thereof for income tax purposes and claimed the resulting loss as an ordinary deduction in computing its taxable income for the years 1954 and 1955.

Respondent argues that even if the 9½ percent which petitioner amortized for book purposes were a fee which it included in its taxable income in the year the mortgages were originated, petitioner realized no economic loss on the sale of the Telesyndicate mortgages to I.S.A. because of petitioner's complete dominion and control over I.S.A.

Petitioner argues that the sales to I.S.A. were for a business purpose, at arm's length, and effected a change in the economic interest in the mortgages sold.

Both parties cite *Crown Cork International Corporation*, 4 T.C. 19 (1944), affirmed per curiam 149 F. 2d 968 (C.A. 3, 1945), in support of their respective positions. *Crown Cork International Corporation*, *supra*, involved the sale of securities by a corporation to its wholly owned subsidiary. In holding the loss resulting thereby nondeductible, we stated in part as follows:

Not all transactions between a wholly owned corporation and its parent are to be disregarded. But where either the relationship between the two is such that they are in fact inseparable, so that the individual existence of the two entities is an unsupported fiction and the "finality" of the loss to the combined enterprise is consequently negatived, cf. *Interstate Transit Lines* v. *Commissioner*, 319 U.S. 590, or the transaction itself is without a true purpose except that of tax avoidance, so that its effectiveness to "change the flow of economic benefits," its "good faith," as an incident of the conduct of a business, is suspect, cf. *Wickwire* v. *United States* (C.C.A., 6th Cir.), 116 Fed. (2d) 679, then taxpayers have failed to show themselves entitled to the benefit of the loss.

\*  \*  \*  \*  \*  \*  \*

\* \* \* It would only be the assumption that the subsidiary could reach and effectuate a decision independent of and unrelated to that of the parent which would warrant the conclusion that their separate existence justifies recognition of intercorporate transactions.

In *Crown Cork International Corporation*, *supra*, this Court found as ultimate facts that the subsidiary was under the complete dominion and control of the parent, and also that the only motive for the sale was to secure a tax saving. We stated that the parent's complete dominion and control over the subsidiary alone was a sufficient ground on which to deny the deduction and set forth as criteria in determining the degree of control held by the parent over the subsidiary

the following: Whether the parent's directors and officers also served in the same capacity for the subsidiary; whether the business of the subsidiary was conducted by an organization separate from the parent; whether the subsidiary organization was capable of making independent decisions; and whether the business functions of the two corporations were sufficiently similar that the two might have been operated as one. We also mentioned the unfairness of the price at which the securities were sold to the subsidiary which, although below the taxpayer's cost, was two and one-half times greater than fair market value. We noted that the subsidiary had no employees but that everything performed for the subsidiary was done by the parent.

Under the criteria set forth in *Crown Cork International Corporation, supra,* I.S.A. was under the complete dominion and control of petitioner. The officers of I.S.A. were also officers of petitioner and they appear to have been paid but one salary which was paid by petitioner. I.S.A. had no employees as such but rather its business functions, i.e., the sale of face-amount certificates and the purchase of mortgages, were performed for I.S.A. by petitioner. Petitioner's dominant role in the intercorporate relationship is shown by the procedure used respecting the sale of mortgages to I.S.A. Petitioner's treasury department determined the time when and the amount in which I.S.A. would invest in mortgages. The selection of the mortgages themselves was made by petitioner's mortgage department without any consultation with I.S.A. and the sale price was set in accordance with an arbitrary and rather complicated procedure by petitioner's accounting department.

Even after the sale was completed the record shows instances where petitioner on its own initiative reacquired the mortgages and sold them to third parties. It appears from the evidence that some of these mortgages were reacquired by petitioner as much as a year and a half after their sale to I.S.A. There is no showing that any of the Telesyndicate mortgages were so reacquired. However, it does not appear that the Telesyndicate mortgages were treated any differently from other mortgages so we must assume petitioner had the power to repossess them if it so chose.

The method used to determine the price at which mortgages were sold to I.S.A. shows a lack of arm's-length dealing between the two enterprises. As we pointed out in connection with the sales of the mortgages arising from the participation projects, the price petitioner charged to I.S.A. for the mortgages was set at petitioner's cost less the unamortized portion of an amount set up on petitioner's books as a discount reserve even though petitioner had not obtained the mortgages at a discount. Petitioner by the use of this bookkeeping method

was always guaranteed a loss on the sale of mortgages to I.S.A. irrespective of the fair market value of the mortgages at the date of the sale.

While the discount reserve set up with respect to the Telesyndicate mortgages represented the amount of fees previously received by petitioner and reported as income, there is no persuasive evidence in the record that the sale price of the Telesyndicate mortgages, computed by reducing the unpaid principal balance by the unamortized portion of the fees received, was reflective of the fair market value of the Telesyndicate mortgages at the date of their sale to I.S.A. which was 4 to 5 years after their acquisition by petitioner.

Petitioner originated these mortgages in 1950 at par and received concurrent therewith a fee equal to about $9\frac{1}{2}$ percent of the face amount of the mortgages. The Telesyndicate mortgages were uninsured and bore an interest rate of 5 percent. Judging from the mortgages sold by petitioner to nonaffiliated third parties during the years in issue, it appears that the price paid by I.S.A. for Telesyndicate mortgages was less than their fair market value. We note that petitioner sold to nonaffiliated third parties during the years in issue some partially insured 4- and $4\frac{1}{2}$-percent mortgages at no discount at all. Other partially insured 4-percent mortgages were sold to nonaffiliates at discounts ranging from 2 to $5\frac{1}{8}$ percent. It does not appear likely that if partially insured 4- and $4\frac{1}{2}$-percent mortgages were sold at no discount at all, that 5 percent uninsured mortgages would sell at a discount of about $9\frac{1}{2}$ percent.

Petitioner produced two expert witnesses who testified that the prices at which mortgages were sold by petitioner to I.S.A. were not less than fair market value. Only one of the witnesses' testimony related directly to the Telesyndicate mortgages, and it is clear that his testimony was based on his surmise that because the Telesyndicate mortgages were in effect originated at a net cost of about 90 and sold at the cost figure, and further because the mortgage market generally had fallen between 1950 and the time of sale in 1954 and 1955, it must have been that the Telesyndicate mortgages were sold at or slightly above market value at the time of sale. However, the witness went on to say that his opinion was based on the general conditions of the market, that to determine whether the individual Telesyndicate mortgages were in fact sold at above or below market value, an appraisal would have to be made, and that no appraisal of the Telesyndicate mortgages was made. In addition, the transaction whereby the Telesyndicate mortgages were originated is not shown in the record. Insofar as the evidence shows, there may have been other considerations for the $9\frac{1}{2}$-percent fee received by petitioner so that the mortgages were acquired at a real net cost in excess of $90\frac{1}{2}$. We hold that petitioner has retained virtual control over the assets transferred and the

loss claimed should not be recognized within the rationale of *Crown Cork International Corporation*, *supra*. See also *Bank of America National Trust & Savings Assn.*, 15 T.C. 544 (1950), affd. 193 F. 2d 178 (C.A. 9, 1951).

Petitioner argues that this case is distinguishable from other cases involving parent-subsidiary relationships in that the economic interest in the subsidiary, I.S.A., was held by the holders of I.S.A.'s face-amount certficates and not by petitioner. Petitioner points to provisions in the contracts with the certificateholders which allow the board of directors of I.S.A. in its discretion to credit each certificate with amounts determined by the board, but that in any event before cash dividends can be distributed to the shareholders of I.S.A. the certificateholders must be credited with an amount equal to at least one-half of 1 percent of the current surrender value of the certificate.

Although I.S.A. does appear to be funded by amounts paid in by the certificateholders, the extent thereof is not shown. Furthermore, there is no showing that petitioner's control over I.S.A., as mentioned above, was in any way inhibited. It may be noted that I.S.A. never declared a dividend so that it has never been mandatory that additional credits be made to the certificateholders.

Petitioner also argues that the management of I.S.A. was carried on by petitioner through a management contract entered into between the two parties. The record, however, does not show what the terms of the contract were, and the only corroboration petitioner points to for the contract's existence is a $1,642,806.68 item reported on petitioner's 1954 income tax return as fees received from I.S.A.

The cases relied upon by petitioner in which transactions between a parent company and its subsidiary have been recognized for Federal tax purposes, including the recent case of *Long Corporation* v. *United States*, 298 F. 2d 450 (Ct. Cl., 1962), are distinguishable. In none of those cases did the evidence show complete dominion and control over the subsidiary by the parent corporation, and in each of those cases the evidence did show that the transactions between the related corporations were bona fide, at arm's length, and had a business purpose. In *Long Corporation* v. *United States*, *supra*, the taxpayer did not contend that certain expense items denominated therein as "extras" for which it was entitled to reimbursement by its subsidiary were a part of the loss it sustained, but recognized that its foregoing collection of such amounts from its subsidiary was a contribution to the subsidiary's capital.

In view of our holding that the claimed losses by petitioner on mortgage sales to I.S.A. and I.S.T. & G. are not deductible in computing petitioner's Federal income tax, it is unnecessary to consider respondent's alternative contention that recognition of such losses

would frustrate clearly defined public policy, nor to decide whether such losses, if recognizable, are to be treated as capital or regular losses.

Petitioner in 1955 incurred a $102,467.66 loss on the sales of 526 mortgage loans to nonaffiliated third parties.[3] This loss was reported on petitioner's tax return for 1955 as a capital loss. Petitioner now contends that the loss incurred is deductible as an ordinary loss and that it was in error in reporting this loss as a capital loss.

Petitioner argues that the mortgages sold to the nonaffiliated third parties were mortgages held by petitioner for sale to customers in the ordinary course of its trade or business. In support of its position, petitioner points to its method of operation whereby it originated mortgages in amounts exceeding its capacity to fund permanently and its relatively quick resale of many of these mortgages, all resulting in an extremely large volume of sales for 1955 and years preceding.

Notwithstanding petitioner's large volume of mortgage sales, it is clear from the record that petitioner originated and held some of its mortgages as an investment reserve against its outstanding face-amount certificates. The law is settled that a person may be a dealer in a particular type of asset and yet hold assets of the same nature for investment purposes. *George R. Kemon*, 16 T.C. 1026, 1033 (1951).

Petitioner has not shown in what capacity it held the mortgages sold to nonaffiliated third parties. In fact, there is no evidence directly relating to how these mortgages were acquired, how long they were held, or why they were sold. Petitioner for the years 1948 through 1953 reported gains on the sales of mortgages to nonaffiliated third parties as capital gains and for the year 1955 reported such losses as capital losses. Petitioner is entitled to have its tax liability determined on the basis of the true facts. *Gutterman Strauss Co.*, 1 B.T.A. 243 (1924). However, it should be observed that the manner in which petitioner did report the sales to nonaffiliated third parties is of significance in assaying the true nature and effect of such sales. Cf. *John G. Curtis*, 12 T.C. 810 (1949), affd. 183 F. 2d 7 (C.A. 7, 1950). This is particularly true where, as here, there is no other pertinent evidence in the record dealing with the transactions.

Petitioner has failed to show that in 1955 it erroneously reported its loss on the sales of mortgages to nonaffiliated third parties as a capital loss.

*Decision will be entered for the respondent.*

---

[3] It may be noted that with respect to the sales of mortgages to third parties, respondent does not make the contention, as he does with respect to the sales to the subsidiaries, that part of the cost of the mortgages should be allocated to petitioner's proprietary interest in the builder but rather allowed the entire amount paid for these mortgages as their basis.