AERO WAREHOUSE CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Aero Warehouse Corp. v. Commissioner
Docket Nos. 29226-85; 31506-85; 38814-85.
United States Tax Court
T.C. Memo 1989-180; 1989 Tax Ct. Memo LEXIS 183; 57 T.C.M. (CCH) 200; T.C.M. (RIA) 89180; April 19, 1989; As corrected April 24, 1989 Michael H. Singer, for the petitioners. Frank Agostino and Michael R. Rizzuto, for the respondent. WELLS
MEMORANDUM *189 FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies and additions to tax in these consolidated cases: Petitioner(s)
Year
Deficiency
Aero Warehouse Corporation
1981
$ 118,832
Gary D. Pesnell and Judy A. Pesnell
1981
28,792   Charles S. Nagy and Lynne I. Nagy
1981
12,126   [2] Additions To Tax, Sections Petitioner(s)
6653(a)(1)
6659
Aero Warehouse Corporation
Gary D. Pesnell and Judy A. Pesnell
* $ 1,439.60
$ 4,743
Charles S. Nagy and Lynne I. Nagy
Respondent also determined that all petitioners were liable for increased interest under section 6621(c) (formerly designated section 6621(d)). The instant case presents the following issues: (1) whether petitioners are entitled to investment tax credits and *190 deductions for a loss generated by a limited partnership, (2) whether petitioners are liable for additions to tax under section 6659, (3) whether petitioners are liable for additions to tax under section 6653(a), (4) whether petitioners are liable for increased interest under section 6621(c), and (5) whether the applicable statute of limitations bars assessment against petitioners Charles S. and Lynne I. Nagy. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Aero Warehouse Corporation had its principal place of business in New Jersey when it filed its petition. Petitioners Gary D. Pesnell, Judy A. Pesnell, Charles S. Nagy, and Lynne I. Nagy resided in New Jersey when they filed their petitions. Production and Transfer of Master Video Tapes
All petitioners are limited partners in TMJ Associates ("TMJ"). On December 31, 1981, TMJ purchased all rights in 12 master video tapes ("masters") from Life Science Productions, Inc. ("LSP"), a corporation owned in equal shares by Dr. Lawrence DeMann, Sr., and petitioner Charles S. Nagy. The masters *191 were educational and concerned the diagnosis and treatment of temporo-mandibular joint syndrome, an ailment relevant to the practice of chiropractic, dentistry, and possibly other health fields. Dr. DeMann, Sr., himself a chiropractor, had conceived the idea of marketing educational tapes for chiropractors. Possibly as early as 1980, Dr. DeMann, Sr., spoke with Dr. Ernest Napolitano of the New York Chiropractic College ("the college") about the advantages of taped instruction as a means of providing continuing education to chiropractors. Dr. Napolitano and Dr. DeMann, Sr., verbally agreed that the college would "sponsor" continuing education tapes, so long as it retained the right to approve the quality of the tapes as well as the means used to commercially exploit them. Although it was agreed that the college would "sponsor" the tapes, it is apparent that the college agreed to endorse the tapes, rather than provide financial backing. For that financial backing, Dr. DeMann, Sr., turned to Mr. Nagy, whom he knew as someone capable of "putting people together on investment proposals." Discussions between Dr. DeMann, Sr., and Mr. Nagy resulted in a "Production Agreement" dated *192 July 15, 1981, between Chiropractic Video Studies, Inc. ("CVS"), and LSP. CVS was owned in equal shares by Dr. DeMann, Sr. (who, as noted, also owned one-half of LSP), and his son Dr. Lawrence DeMann, Jr. In the Production Agreement, LSP agreed to pay CVS $ 80,000 per master for masters to be produced by CVS. Of the foregoing amount, LSP agreed to pay $ 5,000 per master in cash upon closing, while the remainder of the purchase price was to be represented by a promissory note for $ 75,000 per master due on December 31 of the 15th year following closing. The note was to bear 9-percent interest and be recourse as to principal only. The Production Agreement requires LSP to prepay its note to CVS with any proceeds received from "the sale, rental or other exploitation" of the masters. Specifically, the Production Agreement requires LSP to pay CVS 40 percent of any proceeds received, within 30 days of receipt. Such prepayments are to be applied first to principal and, subsequently, to interest. Prior to the date of the Production Agreement, both Mr. Nagy and Dr. DeMann, Sr., called studios in New York for estimates of the price of one-hour video masters of the type contemplated *193 by Dr. DeMann, Sr. Mr. Nagy obtained estimates ranging from $ 75,000 to $ 150,000, while Dr. DeMann, Sr., was given estimates ranging from $ 100,000 to $ 175,000. Those estimates persuaded Dr. DeMann, Sr., to produce the masters himself, through CVS. The estimates also convinced Mr. Nagy that $ 80,000 was a good price for LSP to pay for a master. Prior to the date of the Production Agreement, Mr. Nagy had also consulted with Martin Fiderer Associates, a marketing firm, for information about the potential market for tapes reproduced from the masters. After entering into the Production Agreement requiring LSP to finance CVS' cost in producing the masters, Mr. Nagy began work on a private placement memorandum that would attract investors. He consulted Appleton-Century-Crofts ("ACC"), a division of Prentice-Hall, Inc. In fact, both Mr. Nagy and Dr. DeMann, Sr., met with a number of people from ACC, including Doreen Berne, in the summer of 1981. After paying $ 5,000, Mr. Nagy obtained a preliminary market study from ACC. Subsequently, ACC supplied Mr. Nagy with an appraisal which valued the masters to be sold to TMJ at $ 500,000 each. The appraisal appeared as an exhibit to the *194 private placement memorandum. ACC had some knowledge of the chiropractor market because it had successfully published a text for chiropractors. Ms. Berne of ACC, however, issued the firm's appraisal without having viewed all of TMJ's masters, because not all of the masters had been completed as of the date of the appraisal, October 30, 1981. The appraisal indicated that ACC would "view the tapes prior to issuing a final statement." No such statement, however, was ever issued by ACC, and no one requested it. Further, the appraisal assumed that the finished masters would be of professional quality and that certain professionals, including Dr. DeMann, Sr., and Dr. Harold Gelb, a dentist of national reputation, would appear on the masters, as represented to ACC. The appraisal also incorporated sales projections prepared by accountants selected by TMJ, Hecht & Katz, who did not express any opinion on the feasibility of any projected amounts because the projections were based upon information and assumptions provided to the accountants. Mr. Nagy formed limited partnerships as a means of raising capital. He ultimately formed five limited partnerships, each to purchase a given group *195 of master video tapes from LSP. Mr. Nagy selected Paul Sanford Flaxman, who had once served as Mr. Nagy's attorney, to serve as general partner of TMJ. Before agreeing to serve as general partner of TMJ, Mr. Flaxman viewed some of the taping of the masters, reviewed the market study prepared by Martin Fiderer Associates, and talked to Ms. Berne regarding ACC's appraisal. Prior to the master sale from LSP to TMJ, the limited partners of TMJ signed subscription agreements obligating them to pay $ 37,000 for each unit of TMJ. Although the TMJ private placement memorandum solicited 35 units, investors purchased only 20 units. The limited partners tendered $ 10,000 per unit with an executed subscription agreement, while the balance of the subscription price was represented by short-term notes in the face amounts of $ 7,500, $ 7,500, and $ 12,000, becoming due on February 15, 1982, May 15, 1982, and February 15, 1983, respectively. Those notes were recourse and bore 9-percent interest. Additionally, each limited partner agreed to assume liability for his pro rata share of the $ 1,600,000 recourse portion of a "Partial Recourse Promissory Note" that TMJ gave LSP for the masters. Thus, *196 for each unit of TMJ purchased, a limited partner assumed up to $ 80,000 of liability. A "Purchase Agreement" between TMJ and LSP obligated TMJ to pay LSP $ 6,000,000 for 12 masters (or $ 500,000 per master). TMJ paid $ 135,000 in cash at closing and gave LSP four promissory notes for the balance of the purchase price. Three of the notes had face amounts of $ 100,000, $ 100,000, and $ 65,000 and became due on March 15, 1982, June 15, 1982, and March 15, 1983, respectively. Those notes were recourse and bore 9-percent interest. The fourth note was the Partial Recourse Promissory Note discussed above. It had a face amount of $ 5,600,000 and becomes due December 31, 1996, bearing 9-percent interest. As noted, only $ 1,600,000 of the principal is recourse. The remainder of the principal and all interest are nonrecourse. The Purchase Agreement requires TMJ to prepay the Partial Recourse Note with any proceeds it receives from the commercial exploitation of the masters. Specifically, TMJ must pay LSP 35 percent of the "Net Sales from exploitation of the Masters" in prepayment of the note. "Net Sales" is defined by the Purchase Agreement as "gross sales (less returns, discounts, *197 allowances and uncollected receivables) generated by * * * [TMJ] directly or indirectly from any commercial exploitation of the Masters." Any prepayments by TMJ first reduce principal for which TMJ is liable, i.e., the recourse portion of the note. Any prepayments in excess of that amount reduce nonrecourse principal and, subsequently, interest. In a "Security Agreement," TMJ granted LSP a lien upon "the * * * [masters] and the products derived from the use and exploitation thereof, including without limitation a lien on the copyrights, model and property rights with respect thereto." Production of the masters began in July 1981, after Dr. DeMann, Sr., and Mr. Nagy entered into the Production Agreement. Production continued into the following December and was not completed until roughly two weeks before the closing of the sale of the masters to TMJ. To produce the masters, CVS hired professional producers, directors, and editors. CVS hired doctors to give the taped lectures and demonstrations. CVS ultimately produced 120 separate master video tapes. It retained 20 and transferred the remaining 100 to LSP, pursuant to the Production Agreement. As noted, LSP sold 12 masters *198 to TMJ. LSP sold the other master video tapes to the other four limited partnerships formed by Mr. Nagy (the "other limited partnerships"). The total cost to CVS of producing all of the masters, without considering the value of the time devoted by Dr. DeMann, Sr., and Dr. DeMann, Jr., did not exceed $ 1,000,000 (or about $ 8,333 per master). Although initially Dr. DeMann, Sr.'s profit from the business venture was to be derived from CVS, which, as noted, he and his son owned in equal shares, Dr. DeMann, Sr., subsequently persuaded Mr. Nagy to give him a 50-percent interest in LSP, which was to have been owned wholly by Mr. Nagy. As of the time of trial, Dr. DeMann, Sr., had made a net profit of some $ 300,000 as the result of his interests in LSP and CVS. Mr. Nagy's profit from the business venture was to be derived from his 50-percent interest in LSP and from Lexson Diversified Investors ("Lexson"), a brokerage firm which received syndication fees of at least $ 30,000 from TMJ. Mr. Nagy was at least part owner of Lexson and a salesman for the firm. Distribution Efforts
In February 1982, TMJ and CVS each received letters from attorneys for Dr. Gelb, who appeared on *199 one of the masters purchased by TMJ. The letters threatened legal action for, inter alia, the unauthorized use of Dr. Gelb's name in the TMJ private placement memorandum. On or about May 18, 1982, Dr. Gelb commenced a civil action against CVS and TMJ. As a result of the ensuing litigation, TMJ delayed any marketing efforts until August 2, 1982. [3]
On August 2, 1982, TMJ entered into a "Distributorship Agreement" with Tele-Course Management, Inc. ("Tele-Course"), a corporation owned wholly by Dr. DeMann, Jr. The Distributorship Agreement required Tele-Course to "use its best efforts to market and sell reproductions of the Masters." In return, Tele-Course could retain proceeds from tape sales, after paying TMJ a "basic fee" of $ 105 per tape. Also, Tele-Course could retain any proceeds from other commercial exploitations of the masters, *200 e.g., tape rentals, after paying 40 percent of those proceeds to TMJ. TMJ paid Tele-Course a $ 20,000 "non-refundable management fee" upon entering into the Distributorship Agreement. Also, TMJ agreed to bear all costs of reproducing the masters, i.e., producing tapes, while Tele-Course agreed to pay all "advertising and promotion expenses." After operating under the foregoing terms for roughly eight months, TMJ and Tele-Course amended the Distributorship Agreement. They agreed that Tele-Course could retain all proceeds from any sort of commercial exploitation of the masters, e.g., tape sales and rentals, after paying TMJ 20 percent of the "net proceeds" from such exploitation. The written amendment to the Distributorship Agreement defined "net proceeds" as "the net amount received after all discounts, returns, allowances, shipping charges, sales and/or use taxes or other deductions from * * * [Tele-Course's] charges to users or purchasers of the tapes." The written amendment specified that it was to be effective April 1, 1983. Tele-Course did attempt to exploit the masters commercially. Dr. DeMann, Jr., sought advice from advertising and marketing professionals in New *201 York City. Tele-Course sent representatives to booths at state conventions, where the representatives would play tapes and distribute sales material. Tele-Course placed advertising and articles in the major chiropractic journals, prepared a catalogue, and solicited business by mail and telephone. Tele-Course also transcribed the masters and prepared examination questions in order to have the masters approved for continuing education credit. Some state approvals were obtained. On or about December 1, 1984, Tele-Course requested additional funds from TMJ and the other limited partnerships. Tele-Course terminated the Distributorship Agreement after TMJ and the other limited partnerships refused to pay the requested amounts. After cancellation of the Distributorship Agreement, Mr. Flaxman and the general partners of the other limited partnerships met to discuss further marketing efforts. One of the general partners, Neil Deutsch, offered to assume marketing responsibilities, and the other general partners agreed. The general partners also agreed that profits and losses would be shared equally by TMJ and the other limited partnerships. Mr. Deutsch's marketing efforts included *202 mailing flyers, hiring a company to reproduce the masters, filling orders, collecting payments, and distributing proceeds after paying expenses. Later, around June 27, 1985, Mr. Deutsch reached agreement with Medical Audio Visual Transcripts ("MAVT"). Mr. Ron Pobuda, president of MAVT, had cautioned Mr. Deutsch not to expect more than $ 100,000 in gross sales as a result of MAVT's marketing efforts. On behalf of TMJ and the other limited partnerships, Mr. Deutsch paid MAVT a $ 21,000 management fee. MAVT agreed to pay TMJ and the other limited partnerships 60 percent of sales less a tape reproduction fee equal to $ 10 per tape. MAVT then conducted two mailings to some 23,000 chiropractors and conditioned further marketing efforts upon the success of such mailings. According to accountings by MAVT dated March 24, 1986, and August 4, 1986, MAVT's mailings produced $ 10,126.56 for TMJ and the other limited partnerships. After the mailings, MAVT made no additional efforts to market tapes. On or about December 4, 1986, TMJ entered into a "Licensing Agreement" with Intravision, Inc. ("Intravision"), a New York corporation. The operative part of the Licensing Agreement stated, "* *203 * * [TMJ] hereby grants to * * * [Intravision] the exclusive right to commercially exploit the Videos in any manner that * * * [Intravision] deems fit and appropriate for the term of this Agreement." For the license, Intravision agreed to make 15 annual payments of $ 167,000 each to TMJ, with the first payment due on December 3, 1987. The Licensing Agreement named each payment a "guaranteed minimum annual royalty fee." As part of a corporate reorganization, discussion of which follows, TMJ gave Intravision a promissory note in the face amount of $ 1,600,000 and bearing 9-percent interest. The note was payable in 15 annual installments of $ 162,000, commencing on December 4, 1987. The note was intended as a substitute for the recourse portion of the long-term note given to LSP by TMJ. The nonrecourse portion of the long-term note was forgiven. Intravision's annual, guaranteed payments to TMJ pursuant to the Licensing Agreement were to exceed TMJ's note payments to Intravision by $ 5,000 each year. The note given to Intravision expressly provided that TMJ would offset its required installments with any "guaranteed annual minimum payment" required by the Licensing Agreement. *204 In the Licensing Agreement, Intravision also agreed to pay TMJ 40 percent of annual "net receipts" in excess of $ 75,000. The Licensing Agreement defined "net receipts" as "gross receipts received by * * * [Intravision] from either the sale, lease, licensing, or other exploitation of the Videos (or reproductions thereof) less the direct selling costs therefor." "Direct selling costs" were defined as follows: all certifiable costs for reproduction, sales or lease commissions, direct marketing expenses such as artist costs, printing costs, postage, collection expenses, and any other expenses incurred by * * * [Intravision] (exclusive of general overhead and administrative expenses not directly related to the commercial exploitation of the Videos and other video tapes involving chiropractics) directly attributable to the selling, leasing, or other commercial exploitation of the Videos (or the reproductions thereof). The Licensing Agreement obligated Intravision to commit at least $ 250,000 to "direct selling costs" and to raise $ 1,000,000 of "equity capital" within six months of the agreement. TMJ agreed to transfer certain assets worth in excess of $ 100,000 to Intravision. *205 Intravision agreed to give TMJ warrants entitling TMJ to purchase as many as 125,000 shares of Intravision's common stock. In a ""Master Agreement" also dated December 4, 1986, TMJ and Intravision agreed that the Licensing Agreement, warrants, and promissory note would be conditioned upon the effectiveness of certain other agreements. Specifically, the Master Agreement required that the Licensing Agreement, warrants, and promissory note be delivered to Daniel M. Wasser, Esq. The Master Agreement also required as follows: Mr. Wasser shall release the executed Documents to the appropriate parties only if certain licensing agreements between Intravision and four (4) limited partnerships and two (2) reorganization agreements between Intravision and (a) Life Science Productions and its shareholders and (b) CVS and its shareholders become effective. The Documents shall not be effective unless and until released by Mr. Wasser. The effect of the Master Agreement was to condition TMJ's agreements with Intravision, i.e., the Licensing Agreement, warrants, and promissory note, upon Intravision's ability to obtain licenses from the other limited partnerships and upon reorganization *206 agreements with LSP and CVS. Intravision acquired LSP and CVS pursuant to those reorganization agreements in section 368(a)(1)(B) reorganizations. Intravision issued its voting common stock for all of the outstanding shares of LSP (held by Mr. Nagy and Dr. DeMann, Sr.) and CVS (held by Dr. DeMann, Sr. and Dr. DeMann, Jr.). As of trial, Intravision was still marketing tapes, less than 50,000 individual tapes made from TMJ masters had been sold, and the limited partners of TMJ had received small or no cash distributions. OPINION 1. Profit Objective
Petitioners' ability to deduct their distributive shares of depreciation and other business expenses incurred by TMJ depends upon the existence of profit objective. Simon v. Commissioner,830 F.2d 499, 500-501 (3d Cir. 1987), affg. T.C. Memo. 1986-156; Deegan v. Commissioner,787 F.2d 825, 826-827 (2d Cir. 1986), affg. T.C. Memo. 1985-219; Taube v. Commissioner,88 T.C. 464, 478 (1987); Porreca v. Commissioner,86 T.C. 821, 843 (1986). Further, if the masters may not be depreciated, their purchase and use will not entitle petitioners *207 to investment tax credit ("ITC"). Sec. 48(a)(1); Taube v. Commissioner, supra at 478. In determining whether the requisite profit objective existed, our inquiry is made at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). This means that we focus our inquiry upon the "intent of the general partner and the promoters," because they control the partnership. Deegan v. Commissioner, supra at 826; Fuchs v. Commissioner,83 T.C. 79, 98 (1984). The requisite profit objective exists if there is an "actual and honest objective of making a profit." Levy v. Commissioner,91 T.C. 838, 871 (1988); Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A "reasonable" expectation of profit, however, is not required. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. If the requisite profit *208 objective is absent, section 183 governs the deductibility of the partnership items. Sec. 183(c). Section 183(b)(1) would allow those deductions allowable regardless of profit objective, e.g., interest and State and local taxes; while section 183(b)(2) would permit deduction of "business" expenses, e.g., depreciation, but only to the extent that gross income generated by the partnership's activity exceeded the deductions allowed by section 183(b)(1). Petitioners bear the burden of proving the existence of the requisite profit objective. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). The issue is one of fact and is resolved on the basis of all surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs; Dreicer v. Commissioner, supra at 645. In resolving the issue, we give greater weight to objective indicia of profit objective than to taxpayers' statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. [4]
*209 In the instant case, we find that TMJ lacked the requisite profit objective when it purchased the masters and, therefore, that deductions attributable to TMJ's commercial exploitation of the masters are allowable only to the extent permitted by section 183 and that TMJ's limited partners are not entitled to ITC. Our finding is based upon the entire record, but certain facts deserve emphasis. Most notably, TMJ did not purchase the masters in an arm's-length transaction, and it paid LSP a grossly-inflated purchase price. CVS produced the masters at a cost of approximately $ 8,333 each ($ 1 million divided by 120). LSP agreed to pay CVS $ 80,000 for each master, with payment of the majority of that price deferred. Then, TMJ agreed to purchase the masters from LSP for $ 500,000 each, with payment of the great majority of that price deferred with nonrecourse, long-term financing. Neither can we ignore nor has petitioner explained the foregoing appreciation in the "value" of the masters. The private placement memorandum itself concedes: "The terms of the transaction between LSP and the Partnership were not an 'arms length' transaction." (Emphasis supplied.) Mr. Flaxman, general *210 partner of TMJ, testified that his attorney, a Mr. Marcus, unsuccessfully attempted to negotiate a lower price for the masters. We do not believe, however, that any negotiation transpired between LSP and TMJ. Rather, the record reflects that Mr. Flaxman agreed, without protest, to the terms of sale established by Mr. Nagy on behalf of LSP. We reject petitioner's assertion that TMJ paid a fair price for the masters. Both Mr. Nagy and Dr. DeMann, Sr., called studios for estimates of the price of one-hour tapes comparable to the masters. Their research produced estimates ranging from $ 75,000 to $ 175,000 per tape. Mr. Nagy concluded, on the basis of his research, that $ 80,000 was a fair price to pay CVS for each master. While $ 80,000 per master may have been a fair price, given the estimates, $ 500,000 per master was clearly excessive. For a number of reasons, we reject the ACC appraisal, which valued the masters at $ 500,000 each. The appraisal was premised upon certain assumptions, including (1) that faculty would be "nationally known, from the chiropractic, dental and other related health professions," (2) that "production quality and script writing" would be of the "highest *211 professional criteria," and (3) the accuracy of sales projections prepared by Hecht & Katz, TMJ's accountants. The first assumption proved unwarranted because Dr. Gelb, touted as a "principal program participant," commenced litigation that resulted in the withdrawal of his tape from the TMJ series. Although ACC assumed that Dr. Gelb would be a "principal program participant," he did not appear in the masters marketed by TMJ. It appears that Mr. Nagy misrepresented Dr. Gelb's role to ACC, resulting in civil litigation and, more importantly for our purposes, a flawed appraisal. Petitioners cite Dr. Gelb's litigation as evidence of the masters' value. They argue that Dr. Gelb sued CVS and TMJ because he felt undercompensated for his work, given the masters' value. Petitioners have mischaracterized the litigation. Our review of the record discloses that Dr. Gelb brought suit because TMJ, in its private placement memorandum, heralded Dr. Gelb as a "principal program participant," despite the fact that Dr. Gelb never authorized such a use of his name. The second assumption, regarding the master's technical quality, was equally dubious. ACC issued its appraisal without viewing *212 all of the masters. Thus, it could not have evaluated the entire series for technical quality. Although ACC promised to view eventually the entire series and issue a supplement to its appraisal, ACC failed to do this. Some evidence of the masters' technical quality is the oral stipulation in the record that 1000 reproductions can be made from each master. Assuming that TMJ could sell reproduced tapes for $ 250 each (a figure used in the ACC appraisal), it follows that the entire TMJ series of 12 masters could yield no more than $ 3 million in gross sales (1000 X 250 X 12). Thus, even without considering reproduction and distribution costs, which have proved to be substantial, petitioners have stipulated that the masters could only generate revenue equal to one-half of their $ 6 million purchase price. Finally, the appraisal expressly relied upon sales projections prepared by TMJ's accountants, who in turn had prepared the sales projections based upon information and assumptions provided to them by TMJ. Consequently, the appraisal can be hardly characterized as an "independent" evaluation of the masters. [5]
*213 In addition to the lack of arm's-length bargaining and the payment of an inflated purchase price, Mr. Flaxman's failure to arrange for the production and distribution of tapes is the sort of unbusinesslike conduct which evinces lack of profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. Before TMJ purchased the masters on December 31, 1981, Mr. Flaxman had not contacted anyone concerning the production and distribution of tapes, much less the cost of those functions. TMJ's profitability, however, depended in part upon the cost of production and distribution. Mr. Flaxman's failure to investigate that cost belies a lack of concern for profit. The agreements regarding production and distribution further evidence Mr. Flaxman's indifference to profit. Tele-Course was owned wholly by Dr. DeMann, Jr., and the terms of the Distributorship Agreement enabled Dr. DeMann, Jr., to receive his slice of a pie which already had been nearly devoured by Dr. DeMann, Sr., and Mr. Nagy. The original Distributorship Agreement allowed Tele-Course to retain 58 percent (($ 250-105) divided by 250) of sales proceeds, while the amended Distributorship Agreement gave Tele-Course *214 a generous 80 percent of these proceeds. We are left with the inescapable conclusion that Mr. Flaxman served as a rather pliable accomplice of Mr. Nagy. He permitted any economic benefits to be skimmed by the promoters of the venture, leaving the limited partners with only promised tax benefits. We view the post-1984 distributor changes and the third-party complaint that TMJ filed against LSP as meaningless window dressing, intended to give the appearance that Mr. Flaxman was in diligent pursuit of profit. The ACC appraisal stated that one of its most important assumptions was that tapes would be brought to market in 1982. Marketing efforts occurring more than three years after production of the masters must be viewed as less important than those occurring shortly after the masters were produced. In conclusion, we find that TMJ lacked the requisite profit objective and hold that section 183 governs the deductibility of items attributable to TMJ's activity. [6]
*215 With respect to the return preparation fee, such a fee normally would be deductible regardless of profit objective. Secs. 183(b)(1), 212(3); sec. 1.212-1(1), Income Tax Regs. Petitioners, however, have failed to substantiate that the "professional fees" were ever "paid or incurred." In light of petitioners' burden of proof (Rule 142(a)), such failure is fatal to the claimed deduction. 2. Section 6659 Addition
Respondent seeks additions under section 6659.[7]Section 6659 imposes an addition to tax if an underpayment is "attributable to a valuation overstatement." See generally Soriano v. Commissioner,90 T.C. 44, 60-62 (1988); Todd v. Commissioner,89 T.C. 912, 915-916 (1987), affd. 862 F.2d 540 (5th Cir. 1988); Zirker v. Commissioner,87 T.C. 970, 978-981 (1986). We have upheld the section 6659 addition in cases disallowing losses under section 183. E.g., Soriano v. Commissioner, supra. *216 The amount of the addition varies from 10 to 30 percent of the portion of the underpayment attributable to the valuation overstatement, with the exact percentage depending upon the extent of the overstatement. Sec. 6659(b). A valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis * * *." Sec. 6659(c). The underpayment attributable to the foregoing valuation overstatement must be at least $ 1,000 for section 6659 to apply. Sec. 6659(d). *217 At the outset, we summarily reject petitioners' argument that section 6659 is inapplicable when section 465 limits deductibility of losses. There is no indication in either section or their histories that the overvaluation addition cannot apply along with section 465. Further, we hold that petitioners are liable for additions to tax under section 6659 because the sum of the correct bases of the masters was $ 1.5 million, while the sum of the masters' claimed bases was $ 6 million, an amount equal to or in excess of 150 percent of the correct amount. Sec. 6659(c). Because $ 6 million is more than 250 percent of $ 1.5 million, the additions should be computed by applying 30 percent to the portions of the underpayments attributable to the overstatement of bases. Sec. 6659(b); Zirker v. Commissioner, supra at 979. We fix the sum of the masters' correct bases at $ 1.5 million, the masters' fair market value on the date of the Purchase Agreement. While generally the basis of property for tax purposes is its cost (sections 167(g), 1011, and 1012), we noted the following *218 exception in Bixby v. Commissioner,58 T.C. 757, 776 (1972): This rule, however, does not apply where a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon "peculiar circumstances" which influence the purchaser to agree to a price in excess of the property's fair market value. * * *
Accord Lemmen v. Commissioner,77 T.C. 1326, 1347-1348 (1981); Jordon v. Commissioner,60 T.C. 872, 879-881 (1973), affd. per curiam 514 F.2d 1209 (8th Cir. 1975); Investors Diversified Services, Inc. v. Commissioner,39 T.C. 294, 305-306 (1962), affd. 325 F.2d 341 (8th Cir. 1963); Mountain Wholesale Co. v. Commissioner,17 T.C. 870, 875 (1951). In the absence of an arm's-length purchase, basis in property may be limited to its fair market value, despite a purchase price in excess of that value. Lemmen v. Commissioner, supra at 1348. TMJ did not purchase the masters in an arm's-length transaction. The private placement memorandum admits as much, and the inflated purchase price paid by *219 TMJ confirms the lack of any real negotiation. Thus, the basis limitation rule set forth in Bixby v. Commissioner, supra, is applicable in the instant case. Based upon the record in the instant case, we find that the fair market value of the masters on the date of the Purchase Agreement was $ 1.5 million, a value we compute by averaging the highest and lowest estimates obtained by Mr. Nagy and Dr. DeMann, Sr., for the prices charged by independent studios for video tapes comparable to the masters (($ 2.1 million plus $ .9 million) divided by 2). The record lacks other reliable evidence of the masters' value. We have already discussed and found unreliable the ACC appraisal presented by petitioners. The appraisal of respondent's expert was discredited by the expert's admission that a 1.5 percent penetration of the chiropractor market reasonably could be expected from a mail solicitation. The appraisal of respondent's expert, however, was premised upon the sale of 150 tapes or a market penetration of only .65217 percent (150 divided by 23,000 chiropractors). This Court need not accept the opinion of any expert witness. Chiu v. Commissioner,84 T.C. 722, 734 (1985). *220 Moreover, we cannot adopt with any degree of confidence as an indicator of fair market value the $ 80,000 paid by LSP to CVS for each master. Dr. DeMann, Sr., held a 50-percent interest in both entities, suggesting an absence of arm's-length dealing. We hold that the masters' fair market value, $ 1.5 million, constituted the sum of the masters' bases and that any amount paid or agreed to be paid in excess of that amount must be attributed to other items, possibly Mr. Nagy's promotional services, Dr. DeMann, Sr.'s production work, or promised tax benefits. In any event, the masters' bases for purposes of depreciation and ITC were limited to a total amount of $ 1.5 million, and to the extent depreciation and ITC were based upon additional claimed bases in the total amount of $ 4.5 million, the underpayments are attributable to a valuation overstatement. Zirker v. Commissioner, supra at 979. Respondent next argues that, for the purpose of applying the section 6659 addition, the sum of the masters' bases should be further reduced by "discounting" the bases pursuant to section 483(a). We reject respondent's argument because section 483(d), as in effect for the year *221 in issue, prohibits the application of section 483(a) to payments with indefinite due dates, until the payments are made. [8]
*222 Essentially, section 483 imputes interest to certain contracts for the sale or exchange of property. Sec. 483(a). Imputed interest is not a part of a purchaser's basis in property. Sec. 1.483-2(a)(1)(i), Income Tax Regs. Nevertheless, section 483 applies only if a contract has "total unstated interest" and certain other conditions are present. Sec. 483(c). Section 483(b) requires that certain deferred payments be discounted to present value in order to ascertain whether there is total unstated interest and, therefore, whether section 483 applies. For contracts entered into on December 31, 1981, the date TMJ bought the masters, the regulations prescribe that a nine-percent "test rate" be used to discount payments. Sec. 1.483-1(d)(1)(ii)(C), Income Tax Regs.
If section 483 applies, a portion of the total unstated interest is imputed to each deferred payment. Sec. 483(a). The regulations, however, prescribe that a ten-percent discount rate be used to determine the amount of total unstated interest imputed to a contract, after it *223 has been determined that section 483 applies. Sec. 1.483-1(c)(2)(ii)(C), Income Tax Regs. This is so because section 483(c), as in effect for the transaction in issue, requires that a lower discount rate ("test rate") be used to determine whether section 483 applies. When, as in the instant case, the due dates of payments are uncertain because of a mandatory prepayment provision, it is impossible to discount deferred payments to present value. Therefore, it is also impossible to determine whether there is total unstated interest and whether section 483(a) applies. For the transaction in issue, section 483(d) addresses this problem by requiring that such payments be separately discounted when made.Section 1.483-1(e)(1), Income Tax Regs., makes this clear: In the case of a contract be for the sale or exchange of property under which there are any indefinite payments, section 483 shall be separately applied to each such indefinite payment as if it * * * was the only payment due under the contract, and the effect of the application *224 of section 483 shall be determined at the time such payment is made. [Emphasis supplied.] Thus, when a mandatory prepayment is made, it is to be discounted at that time in order to determine what portion, if any, represents total unstated interest. By its express terms, section 483(d) does not provide a method for imputing interest to contracts involving indefinite payments "at the time of the sale or exchange." Thus, section 483(a) cannot be used to fix the initial basis of property. Moreover, no other provision in section 483, as in effect for the year in issue, permits the discounting sought by respondent in the instant case. [9]
*225 In Caruth v. United States,566 F.2d 901 (5th Cir. 1978), the court recognized that section 483 (including section 483(d) as it existed prior to amendment by the DRA) provided no method for discounting an obligation requiring payments with indefinite due dates, before the payments were made. In that case, a number of trusts sold real property to a partnership and also became limited partners in the partnership. The purchase price consisted of cash and promissory notes which did not bear interest. Further, the notes required prepayment from the partnership's distributions of "net cash flow" to the trusts. The trusts argued that the notes they received should be discounted pursuant to section 483 in computing the amount realized from the sale of the real property. The court, however, disagreed and held that section 1001 required that the notes be included in the amount realized at fair market value. The court reasoned that section 483(d) was applicable because of the mandatory prepayment provision and that it precluded a discounting of the notes pursuant to section 483(a)-(c). The court explained, *226 The provisions of section 483 applicable to definite, non-interest bearing notes are so simple to apply that regulations provide a tabular computation which simply discounts the face amount of the note to its present value by attributing a part of the principal to interest at a specified rate. Such a computation is impossible if the date of payment cannot be determined from the face of the instrument. [Emphasis supplied.] Caruth v. United States, supra at 905. While Caruth v. United States, supra, decided the amount realized by a seller of property, we see no reason why a purchaser's cost basis should be determined under a different rule. Sec. 1.483-2(a)(1)(i), Income Tax Regs. In either case, if a contract for the sale of property requires payments with indefinite due dates, section 483(a) cannot be used to discount the contract. Insofar as Revenue Ruling 82-224, 1982-2 C.B. 5, may be read to require a different result, we disagree with the ruling. We further note that revenue rulings merely represent respondent's position on specific factual situations rather than substantive authority. *227 Stark v. Commissioner,86 T.C. 243, 250-251 (1986). We also decline to reduce the bases by eliminating the recourse portion of the long-term note and find that LSP did intend to enforce TMJ's liability. Crane v. Commissioner,331 U.S. 1 (1947); sec. 1.1012-1, Income Tax Regs. Our finding is based upon the fact that both Mr. Nagy and Dr. DeMann, Sr., looked to LSP (which they owned in equal shares) for part of their profit from the project. Enforcement of the long-term note's recourse portion would augment that profit. Moreover, $ 2 million ($ 400,000 cash plus $ 1.6 million of recourse financing) approximated a fair price for the 12 masters, considering the estimates obtained by Mr. Nagy and Dr. DeMann, Sr. (i.e., $ 75,000 to $ 175,000 each, or a total of $ 900,000 to $ 2,100,000). Petitioners contend that respondent should have waived the section 6659 additions, as permitted by section 6659(e). That subsection grants the Commissioner the authority to waive all or a portion of the section 6659 addition "on a showing *228 by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." Assuming we have the authority to review respondent's refusal to grant relief ( Mailman v. Commissioner,91 T.C. 1079 (1988)), we decline to afford such relief in the instant case. The only evidence of "reasonable basis" or "good faith" presented by petitioners is the ACC appraisal. That appraisal was flawed on its face, as it acknowledged that the masters had not been viewed and that it relied upon sales projections which were prepared by TMJ's accountants and based upon TMJ-supplied information and assumptions. The ACC appraisal also promised a supplement after the masters had been completed and viewed, but no supplement was prepared, and no TMJ partner, general or limited, asked for the supplement. Under the circumstances, relief under section 6659(e) is unwarranted. 3. Section 6653(a) Addition
Respondent seeks additions for negligence. Under section 6653(a)(1), "If any part of any underpayment * * * is *229 due to negligence or intentional disregard of rules or regulations," an addition of five percent of the entire underpayment is imposed. Further, section 6653(a)(2) increases the addition by 50 percent of the interest due on the portion of the underpayment "which is attributable to the negligence." We have defined negligence as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners argue that section 6653(a) additions should not be imposed against them because they relied upon the advice of their accountants and the contents of the private placement memorandum when preparing their returns. We reject petitioners' defense and sustain imposition of the negligence addition because petitioners failed to procure independent advice prior to purchasing their limited partnership interests and reporting ITC and pass-through losses on their returns. We find apropos the following excerpt from Ryback v. Commissioner,91 T.C. 524, 565 (1988), In these circumstances petitioners did not rely on competent, independent parties; they *230 did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations. * * * In the instant case, the accountants to whom petitioners refer are Hecht & Katz, who served as TMJ's accountants. We find that those accountants were not a source of independent counsel. Similarly, the private placement memorandum was not such a source. Thus, petitioners' reliance upon those sources does not militate against imposition of the section 6653(a) addition. 4. Section 6621(c) Increased Interest
Section 6621(c)(1) provides for an increased interest rate on "any substantial underpayment attributable to tax-motivated transactions." Section 6621(c)(3)(A) itemizes certain transactions that are deemed "tax-motivated" within the meaning of the subsection. In section 6621(c)(3)(B), Congress delegated to the Secretary the authority to "specify other types of transactions which will be treated as tax-motivated for purposes of this subsection * * *. *231 " Section 301.6621 -2T, Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50394 (December 28, 1984), brings within section 6621(c) substantial underpayments resulting from disallowances under section 183. Consequently, we hold that petitioners are liable for increased interest under section 6621(c). 5. Statute of Limitations
Petitioners Mr. and Mrs. Nagy (the "Nagys") argue that assessment against them for taxable year 1981 is barred by the three-year statute of limitations set forth in section 6501(a). Section 6501(a) requires the assessment of tax liability "within 3 years after the return was filed * * *." Sections 6503(a)(1) and 6213(a) combine to toll the foregoing limitations period upon the issuance of a statutory notice of deficiency. Thus, in the instant case, we must decide whether respondent issued his statutory notice within three years of the date the Nagys "filed" their return for taxable year 1981. The Nagys obtained an extension allowing them until August 15, 1982, to file their return for taxable year 1981. They mailed their return on July 21, 1982, and *232 respondent received the return on July 23, 1982. On July 23, 1985, respondent issued a statutory notice of deficiency for the 1981 taxable year. Petitioners contend that their return was filed on its mailing date and cite section 7502(a) and Hotel Equities Corp. v. Commissioner,546 F.2d 725 (7th Cir. 1976), for this proposition. If the return was indeed filed on its mailing date, then assessment against the Nagys is barred by section 6501(a). Respondent contends that the Nagys' return was filed on the date of its receipt by respondent. Respondent reasons that section 7502(a) is not applicable in the instant case, because the Nagys' return was received by respondent within an extended period allowed for filing. Respondent cites, among other authorities, Pace Oil Co. v. Commissioner,73 T.C. 249 (1979). Respondent concludes that assessment is not barred by section 6501(a) because he issued his statutory notice within three years of the date he received the Nagys' return. We agree with respondent and hold that section 6501(a) does not prevent assessment against the Nagys. In Pace Oil Co. v. Commissioner, supra at 253, we *233 confronted the same issue presented here and concluded as follows: On its face, section 7502(a) evidences the express purpose that the date of mailing of a return be deemed to be the date of its delivery only where it would otherwise be considered as untimely filed. There is no indication that this rule is to apply to returns that are timely without regard to section 7502(a), i.e., returns that are delivered prior to the expiration of an extended period for filing. [Emphasis supplied.] Moreover, we do not agree with petitioners' assertion that Hotel Equities Corp. v. Commissioner, supra, mandates a contrary result. As pointed out in First Charter Financial Corp. v. United States,669 F.2d 1342, 1346-1347 (9th Cir. 1982), Hotel Equities Corp. v. Commissioner, supra, involved a return that was not timely received. In such instances, section 7502(a) does characterize the mailing date as the "filing" date. The facts in the instant case are distinguishable, and we perceive no conflict between our opinion in Pace Oil Co. v. Commissioner, supra, *234 and Hotel Equities Corp. v. Commissioner, supra.
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners have been consolidated herein: Gary D. Pesnell and Judy A. Pesnell, docket No. 31506-85; and Charles S. Nagy and Lynne I. Nagy, docket No. 38814-85. Except as otherwise noted, for convenience we will refer to the foregoing consolidated cases collectively as the "instant case."↩
2. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
*. Plus 50 percent of the interest due on the portion of the underpayment attributable to negligence per section 6653(a)(2)↩.
3. TMJ subsequently filed a third party complaint for indemnity against LSP. Although the outcome of the litigation is unclear, it appears that TMJ ultimately returned Dr. Gelb's master to LSP in exchange for four other masters. Dr. Gelb's master was never exploited by TMJ. There is some evidence that Dr. Gelb himself is marketing tapes.↩
4. Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of nine factors, derived from case law, to be considered in determining whether an activity is engaged in for profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Benz v. Commissioner,63 T.C. 375, 382-383 (1974). The factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative, and, as noted, all surrounding facts and circumstances, including factors not listed, are to be considered. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371↩ (1986).
5. In view of our finding that the ACC appraisal was inflated, we need not rule upon respondent's request that the testimony of Ms. Berne, of ACC, be excluded.↩
6. Our finding that TMJ lacked the requisite profit objective renders it unnecessary to decide whether the masters were "placed in service" in 1981 for purposes of depreciation and ITC. Because TMJ reported no gross income in that year, TMJ is entitled to no depreciation in any event. Further, TMJ's partners are entitled to no ITC regardless of the date the property was "placed in service," because TMJ is not entitled to depreciate the masters. Sec. 48(a)(1). Also obviated by our holding are counsels' arguments regarding whether the masters qualify for ITC and the proper basis for computing ITC. Although we sustain disallowance of ITC and deductions for the partnership loss upon the ground that TMJ's activity was subject to section 183, we would have arrived at the same result by analyzing TMJ under the framework set forth in Rose v. Commissioner,88 T.C. 386 (1987), affd. 865 F.2d 851 (6th Cir. 1989), as suggested in respondent's briefs. We decline to consider respondent's argument that TMJ entered into a joint venture for the exploitation of the masters, because our holding that section 183 governs TMJ's activity renders it unnecessary to decide this issue. Finally, our holding that section 183 governs TMJ's activity also obviates any need to consider the extent to which petitioners' ability to deduct a flow-through loss and take ITC was circumscribed by the at-risk rules of section 465. In the instant case, the absence of "otherwise allowable" deductions under section 183(b)(1)↩ means that petitioners are entitled to deduct none of TMJ's reported loss.
7. Although respondent determined additions under sections 6653(a) and 6659 against petitioners Mr. and Mrs. Pesnell, respondent failed to determine some of these additions to tax against the other petitioners. At the conclusion of trial, however, respondent moved under Rule 41(b) for an order amending the pleadings to conform to the proof at trial. Petitioners did not object to the motion, and respondent contends that all additions to tax are therefore in issue for all petitioners. Because petitioners concede in their briefs that additions to tax may be brought into issue through a Rule 41(b) motion, we hold that additions under sections 6653(a) and 6659 are in issue for all petitioners. Of course, the burden of proof on the issue of whether a particular addition to tax is applicable to a given petitioner depends upon whether the addition to tax was determined in the notice of deficiency issued to that petitioner. Rule 142(a)↩.
8. For the year in issue, section 483(a)-(d) provides as follows: (a) Amounts Constituting Interest. -- For purposes of this title, in the case of any contract for the sale or exchange of property there shall be treated as interest that part of a payment to which this section applies which bears the same ratio to the amount of such payment as the total unstated interest under such contract bears to the total of the payments to which this section applies which are due under such contract. (b) Total Unstated Interest. -- For purposes of this section, the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of -- (1) the sum of the payments to which this section applies which are due under the contract, over (2) the sum of the present values of such payments and the present values of any interest payments due under the contract. For purposes of paragraph (2), the present value of the payment shall be determined, as of the date of the sale or exchange, by discounting such payment at the rate, and in the manner, provided in regulations prescribed by the Secretary. Such regulations shall provide for discounting on the basis of 6-month brackets and shall provide that the present value of any interest payment due not more than 6 months after the date of the sale or exchange is an amount equal to 100 percent of such payment. (c) Payments to Which Section Applies. -- (1) In general. -- Except as provided in subsection (f), this section shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract -- (A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and (B) under which, using a rate provided by regulations prescribed by the Secretary for purposes of this subparagraph, there is total unstated interest. Any rate prescribed for determining whether there is total unstated interest for purposes of subparagraph (B) shall be at least one percentage point lower than the rate prescribed for purposes of subsection (b)(2). (2) Treatment of evidence of indebtedness. -- For purposes of this section, an evidence of indebtedness of the purchaser given in consideration for the sale or exchange of property shall not be considered a payment, and any payment due under such evidence of indebtedness shall be treated as due under the contract for the sale or exchange. (d) Payments that are indefinite as to time, liability, or amount. -- In the case of a contract for the sale or exchange of property under which the liability for, or the amount or due date of, any portion of a payment cannot be determined at the time of the sale or exchange, this section shall be separately applied to such portion as if it (and any amount of interest attributable to such portion) were the only payments due under the contract; and such determinations of liability, amount, and due date shall be made at the time payment of such portion is made.↩
9. Section 483 has undergone significant amendment since the date of the transaction in issue, and we express no opinion respecting the treatment of transactions subject to the amendments. Most notable are certain changes made by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 553-555 (the "DRA"). Section 483(d) (concerning indefinite payments) was deleted. Section 483(f)(1) (formerly (g)(1)) was added, and it directs respondent to prescribe regulations providing for the application of section 483 to contracts involving indefinite payments. Further, the DRA added new section (d)(1) which exempts from section 483, transactions governed by the original issue discount rules of section 1271 et seq. The DRA further coordinated section 483 with the original issue discount rules by amending section 483(b) and (c) to require that total unstated interest be computed by discounting deferred payments under the method required by section 1274(b)(2) and by using discount rates tied to the applicable Federal rate. Consequently, the discount rates and corresponding tables of discount factors set forth in the current section 483 regulations ( sec. 1.483-1(g)(2), Income Tax Regs.) generally do not govern transactions entered into after December 31, 1984. It also should be noted that current law prescribes use of the same discount rate for both ascertaining whether section 483 applies and determining the interest to be imputed. Sec. 483(b)↩ (flush language).